## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------
```
FINANCIAL TECHNOLOGY
PARTNERS LP AND FTP
SECURITIES LLC,

     Plaintiffs,

   v.

CIRCLE INTERNET FINANCIAL
LIMITED, PLUTO HOLDINGS, INC.,
SEEDINVEST TECHNOLOGY LLC,
SI SECURITIES LLC AND SI
ADVISORS I, LLC,

     Defendants.
```
--------------------------------------------------------
```

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 1:24-cv-04717-VM-SDA

Judge Victor Marrero
Magistrate Judge Stewart D. Aaron

## <u>AMENDED COMPLAINT</u>

   Plaintiffs Financial Technology Partners L.P. and FTP Securities LLC (together, "FT Partners"), through their undersigned counsel, for their Amended Complaint against Defendants Circle Internet Financial Limited ("Circle"), Pluto Holdings, LLC ("Pluto"), SeedInvest Technology LLC ("SeedInvest Technology"), SI Securities, LLC ("SI Securities"), and SI Advisors I, LLC ("SI Advisors," and, together with SeedInvest Technology and SI Securities, "SeedInvest") state as follows:[1]

---

[1]  FT Partners expressly reserves and does not waive its right to move for a remand for lack of subject matter jurisdiction.

## NATURE OF THE ACTION

1.    This dispute arises from Circle's improper attempt to terminate its long-term financial advisor, FT Partners, in order to avoid paying significant fees owed, and that might likely in the future be owed, under the clear terms of the parties' two contractual agreements.  Circle undertook these improper actions despite the fact that, up until (and even some time after) this dispute began, FT Partners had achieved significant success for Circle and Circle had continuously praised FT Partners' work for Circle.  But Circle cannot establish any of the specified prerequisites for the termination of either of the agreements, so they both remained in full force and effect.  FT Partners accordingly brings this action seeking, among other things, a declaratory judgment that the primary agreement was not terminated, such that Circle is obligated to abide by its terms.  FT Partners also seeks damages for all fees, expenses, interest, and attorney's fees that Circle is currently required to pay under the parties' agreements.

2.    In May 2020, Circle was a nascent and embattled financial technology company that was losing millions of dollars per month, had rapidly dwindling cash reserves, had failed to raise money using three separate major investment banking advisors, and was under investigation by multiple U.S. regulators.  It was also unable to convince any of its own highly sophisticated stockholders to contribute any more capital to the business, and had told those stockholders that "there was substantial doubt of the Company's ability to continue as a going concern."

3.    Circle then proactively reached out for help from FT Partners, a leading investment bank that specializes in advising financial technology companies, and its CEO and founder Steve McLaughlin.  Circle engaged FT Partners as a long-term and exclusive financial and strategic advisor because Circle wanted to be saved, and then it wanted to achieve enormous financial success.

4.    Even though Circle was sitting at the brink of bankruptcy and it was highly uncertain whether Circle would ever be successful in completing a capital raise and/or company sale that would generate the contingency-based fees that investment bankers earn, FT Partners agreed to take Circle on as a client but only under certain specified terms. In doing so, FT Partners undertook the substantial risk that FT Partners could end up doing years of substantial work for Circle for minimal compensation.

5.    The parties negotiated and formalized their first agreement in a July 1, 2020 engagement letter ("Circle Agreement"). Throughout that process, Circle was advised by experienced outside counsel and its own sophisticated officers and Board of Directors.

6.    As compensation for the extraordinary risk of working with a distressed company, Circle promised to pay substantial contingency fees to FT Partners should Circle successfully execute certain transactions. Those fees would be based on the amount or value that Circle raised in new capital, or received in consideration when selling itself or merging, thus aligning FT Partners' and Circle's interests.

7.    *First*, FT Partners would be entitled to a fee of 7% of the gross proceeds of any Capital Raise, defined by the Circle Agreement as including any "transaction in which the Company or the Company's stockholders sell to an investor . . . equity interests . . . representing less than 50% of" Circle's stock.

8.    *Second*, FT Partners would be entitled to a fee in the event of a "Company Sale," defined in the Circle Agreement as "(a) the sale of all or at least 50%" of Circle's stock, "(b) the merger or combination of [Circle] with an acquirer or (c) an acquirer's acquisition of all or at least 50%" of Circle's assets or income. The fee would be based on the "Aggregate Consideration" distributed to Circle and its stockholders: "3% of the first $400 million" of Aggregate

Consideration, plus "6% of any portion of Aggregate Consideration" between $400 million and $1 billion, plus "10% of any portion of Aggregate Consideration in excess of $1 billion." These particular percentages and hurdles were the subject of extensive negotiation, and Circle fully agreed to them to entice FT Partners to take on such a risky assignment. Together, these percentages and hurdles demonstrate the parties' clear understanding at the time that it would be possible but highly unlikely for Circle to find an acquirer at all, much less one that would value it in excess of $1 billion.

9.      The Circle Agreement also specified in no uncertain terms that FT Partners was entitled to earn these fees on Company Sale or Capital Raise transactions "regardless of how much time has elapsed from the date of this letter agreement and without regard for the extent to which [Circle] actively involves FT Partners in such Transactions." This provision was specifically created to protect FT Partners from any scenario in which, at a later date and for any reason, Circle was to choose to not use FT Partners in any or all future transactions. As such, this provision made it abundantly clear to all parties that FT Partners was to be paid for future transactions for taking this engagement on at such a risky point in Circle's history, even if Circle became incredibly valuable and did not want to use FT Partners as its advisor.

10.     *Third*, for transactions on which FT Partners advised Circle and that were neither a Company Sale nor a Capital Raise (such as advising on an acquisition by Circle of another company), FT Partners would be entitled to a fee "which will take into account, among other things, the custom and practice among investment bankers in similar size and type of transactions."

11.     Moreover, the Circle Agreement provided that FT Partners would be Circle's "exclusive financial and strategic advisor," and committed Circle to "reference [] FT Partners' role as exclusive financial and strategic advisor" in "any press release . . . announcing a transaction."

The Circle Agreement also permitted FT Partners to publicize its role via "announcement[s] . . . stating that FT Partners has acted as the exclusive financial and strategic advisor to [Circle]," and although Circle had the right to approve such announcements, such approval could "not [] be unreasonably withheld or delayed."

12.     In addition, Circle agreed that the Circle Agreement would remain in effect until the earlier of Circle completing a Company Sale or Circle validly terminating the Circle Agreement for one of three extremely narrow and specified "Good Reason[s]"—each of which was limited to circumstances in which FT Partners both actively and materially harmed Circle's interests or key FT Partners executives were somehow unable or unwilling to help Circle—that would give rise to a termination right if not cured by FT Partners.  This meant that, absent a valid termination for a specified Good Reason—which requires that (i) one or more of the three specified Good Reasons has, in fact, occurred; (ii) Circle's Board then makes a good-faith determination that a Good Reason has occurred; (iii) Circle timely gives FT Partners written notice that Circle's Board has determined in good faith that "such Good Reason" exists, and that notice provides FT Partners with sufficient information concerning the specified Good Reason to allow FT Partners to determine whether it can cure the Good Reason and how to cure the Good Reason; (iv) if curable, FT Partners does not cure the Good Reason within 30 days of notice; and (v) if curable, Circle's Board then determines in good faith that FT Partners has failed to cure such Good Reason within 30 days—the Circle Agreement would continue over time even if Circle completed one or more successful Capital Raises or alternative transactions that generated fees for FT Partners.

13.     FT Partners insisted in an email to Circle that the "term" of the relationship provided by the Circle Agreement would be "[l]ifetime / permanent" with "[n]o loopholes," and

Circle's CEO agreed, responding to FT Partners' email in a May 25, 2020 email: "I can live with this.  Blood brothers.  Let's do something great together!"

14.     Circle, including its CEO, Board of Directors, and highly experienced outside counsel, thus was fully aware from day one what it was signing up for.  In fact, Circle gladly accepted the terms of its agreement with FT Partners, because under those terms, whenever Circle paid fees to FT Partners, that necessarily meant Circle was achieving more of the financial success it wanted.

15.     After entering into the Circle Agreement, FT Partners helped Circle accomplish a dramatic reversal of fortunes.  Leveraging a combination of FT Partners' work, experience, contacts, credibility, and capital-raising expertise, Circle initially raised: (i) $25 million in financing in July 2020 ("Debt Financing"), and (ii) an additional $440 million in May 2021 through the issuance of convertible notes ("Convertible Note Financing").  Circle gladly paid FT Partners the applicable fees for those raises.

16.     Third-party reports demonstrate that Circle's ability to raise capital had been virtually non-existent until it retained FT Partners, after which its ability to attract financing drastically improved:



*Source: https://www.crunchbase.com/organization/circle-2/company_financials*

17.    Pleased with FT Partners' work and success after two-and-half months on the job, Circle next signed a completely new second engagement agreement for FT Partners to raise additional funds to resolve Circle's precarious cash position by serving as financial and strategic advisor to Defendants in connection with a possible sale, capital raise, or other transaction involving Circle's SeedInvest subsidiaries.  Notably, here Circle agreed to a virtually identical type of long-term fee arrangement and similar key financial and other terms as were already contained in the Circle Agreement in order to continue incentivizing FT Partners to devote substantial energy to securing Circle's success, thus demonstrating that Circle was of course extremely happy with the Circle Agreement.  This second agreement was formalized in a September 19, 2020 engagement letter ("SeedInvest Agreement") between Circle, on behalf of itself and the other Defendants, and FT Partners.

18.    Like the Circle Agreement, the SeedInvest Agreement provides that FT Partners would be entitled to a Transaction Fee if SeedInvest successfully executed certain significant transactions, including an "SI Sale."  The SeedInvest Agreement defines SI Sale analogously to

the definition of a Company Sale in the Circle Agreement: "(a) the sale of all or at least 50%" of SeedInvest's stock, "(b) the merger or combination of SeedInvest with an acquirer or (c) an acquirer's acquisition of all or at least 50% of the assets, properties, revenue, income or business of SeedInvest."  The fee would be based on the "Aggregate Consideration" distributed to Circle or its affiliates:  $1.5 million, plus "6% of any portion of Aggregate Consideration . . . in excess of $25,000,000, up to and including $40,000,000," plus "15% of any portion of Aggregate Consideration in excess of $40,000,000."  As with the Circle Agreement, this top tier percentage of fully 15% of incremental value above $40,000,000 clearly demonstrates that Circle was willing and happy to again provide FT Partners a significant incentive should it help achieve an exceptional result.  And that Circle agreed to a 15% bracket in the SeedInvest Agreement refutes any claim that the 10% top bracket Circle agreed to in the Circle Agreement was excessive.

19.     Thanks to FT Partners' assistance, in March 2021 Circle was able to line up a prospective buyer willing to offer an attractive price for SeedInvest.

20.     FT Partners also helped to secure a Company Sale of Circle to Concord Acquisition Corp. ("Concord"), a Special Purpose Acquisition Company ("SPAC").  Notably, Concord was a party that was known to FT Partners, but was unknown to Circle and vice versa.  Therefore, it was FT Partners that brought Concord directly to Circle and vice versa.  On March 6, 2021, Circle and Concord entered into a non-binding term sheet negotiated in large part by FT Partners contemplating that Concord would acquire Circle.  In light of this development, Circle no longer needed to urgently raise additional cash, and later that month decided not to go through with the sale of SeedInvest.  Following Mr. McLaughlin's efforts on behalf of Circle in connection with the Acquisition, a Circle Board member, who was a senior partner at a prominent venture capital firm, referred to Mr. McLaughlin as "one of the best negotiators I've ever seen."

21.     On July 7, 2021, Concord agreed to a stock-for-stock merger whereby Circle stockholders would sell all their Circle shares in exchange for shares of Circle Internet Finance Public Limited Company ("TopCo"), a holding company formed specifically for the purpose of combining Circle with Concord ("Acquisition").   As part of the arrangement, Concord's shareholders would exchange their Concord shares for TopCo shares.

22.     The Acquisition initially valued Circle at *$4.5 billion* plus potential earnouts for Circle's then-current shareholders.  But when it became clear that Circle and Concord would be unable to meet the initial April 3, 2022 closing deadline, they signed a revised agreement on February 16, 2022 that not only extended that deadline to January 2023, but also updated Circle's valuation to *$9 billion*, plus potential earnout payments.

23.     FT Partners played a pivotal role in orchestrating this stunning turnaround of Circle's fortunes.  With FT Partners' help, Circle went from facing the prospect of bankruptcy when it hired FT Partners to having a multi-billion dollar valuation—and being cash rich due to the $440 Convertible Note Financing that FT Partners helped secure for Circle—less than two years later.

24.     But once Circle had the newfound success it was looking for with FT Partners as its long-term strategic advisor, and it was facing the time to pay the fees FT Partners had earned, Circle reneged on its agreements.  Realizing that it would owe FT Partners hundreds of millions of dollars for a Company Sale fee in connection with the Acquisition, Circle had an employee reach out to an FT Partners employee to discuss the fee, while asking that FT Partners employee not to tell Mr. McLaughlin about the call.  Soon after, despite never having any complaints about FT Partners' performance, Circle began a blatant campaign to bully FT Partners into accepting dramatically lower fees than Circle agreed to in the Circle Agreement.  After that tactic failed,

Circle attempted, yet failed, to terminate the Circle Agreement in order to deny FT Partners any fees. Circle's board did not act in good faith in doing so.

25.    Ignoring the obvious economic and legal reality of the transaction—in which a Special Purpose *Acquisition* Company, through a holding company created specifically for this acquisition that was originally named Circle *Acquisition* Public Limited Company, would acquire 100% of Circle's outstanding shares from Circle's shareholders—in February 2021, while FT Partners was still negotiating this acquisition for Circle, Circle began making a number of pretextual and specious arguments that the Acquisition was not a Company Sale, and so no fee based on a Company Sale was due. Those arguments were inconsistent with the plain text of the Circle Agreement, which sets forth three alternative tests for a Company Sale—each of which the Acquisition met. Moreover, Circle did not claim that a de-SPAC transaction such as the Acquisition would not constitute a Company Sale until *after* it realized that—due to the $4.5 billion valuation for Circle that FT Partners had negotiated—Circle would owe FT Partners a substantial Company Sale fee once the Acquisition closed. Rather, Circle only argued that the Acquisition did not constitute a Company Sale after having its outside counsel scour the Circle Agreement for pretexts on which to avoid its contractual obligations and terminate the agreement. Circle's outside counsel must have known that the Acquisition constituted a Company Sale, because that same counsel had worked for another client-company that had paid FT Partners a Company Sale fee after a de-SPAC transaction under a similar agreement.

26.    The timing of Circle's argument shows that it was not made in good faith. To make matters worse, Circle also began to attempt to minimize FT Partners' role going forward and concoct a pretext for Circle to terminate the Circle Agreement. In April 2021, Circle first inexplicably demanded that Steven McLaughlin—FT Partners' CEO, managing partner and

founder—who had in large part designed and negotiated the $440 million Convertible Note Financing and the then-still $4.5 billion Acquisition, no longer be allowed to work on Circle matters. Circle also baldly claimed that FT Partners' position that it was entitled to a Company Sale fee on the Acquisition was somehow a conflict of interest on the part of FT Partners—even though a Company Sale fee fully aligned FT Partners with Circle's goal of closing the deal and maximizing its value. Circle also made the ridiculous allegation that FT Partners' position that it was entitled to a Company Sale fee would prevent the transaction with Concord from signing—something later proved obviously false when, on July 7, 2021, Circle and Concord entered into the Business Combination Agreement at a valuation for Circle of $4.5 billion, and then, on February 16, 2022, into the Transaction Agreement at a valuation for Circle of $9 billion.

27.     Adding insult to injury, Circle refused to fulfill its additional obligation under the Circle Agreement to publicly credit FT Partners for helping secure a multi-billion dollar acquisition for Circle stockholders whose Circle stock was near-worthless a year before. Circle then breached the Circle Agreement again by unreasonably withholding its approval of FT Partners' proposed announcements regarding the Convertible Note Financing and the Acquisition.

28.     In spite of Circle's behavior, FT Partners repeatedly indicated that it would work with Circle to try to resolve the fee issue—including by negotiating how the Transaction Fee would be paid, for example by accepting part or all of it in stock, deferring part of the payment, or restructuring the payment—and was "ready, willing, and able" to assist Circle in any transaction. FT Partners even said it would be willing to consider receiving an alternative transaction fee if Circle agreed that the Circle Agreement would remain in effect following closing of the Acquisition. This would reduce the amount Circle would pay FT Partners upon closing of the

Acquisition, though it could increase the overall amount Circle would eventually need to pay if it entered into a Company Sale in the future. Circle refused to do so.

29.    In sum, Circle correctly recognized from the start, without any prompting from FT Partners, that the Acquisition would constitute a Company Sale. That conclusion was consistent with how other similar transactions had been treated by both FT Partners and Circle's and Concord's outside law firms. Nonetheless, given the size of the Transaction Fee that conclusion would entail, Circle chose to breach its contractual obligations to FT Partners in many ways, rather than honor the Circle Agreement and pay a Company Sale fee.

30.    On April 8, 2022, just two days prior to announcing a new $401 million Capital Raise using work produced by FT Partners that would—absent a valid termination for Good Reason—result in a fee for FT Partners of more than $28 million, Circle's CEO, Jeremy Allaire, sent FT Partners a very short and hastily conceived letter ("Circle Notice") purporting to terminate the Circle Agreement. The Circle Notice stated that its Board of Directors had supposedly determined in good faith that, under Section 6 of the Circle Agreement, "Good Reason[s]" existed to terminate the Circle Agreement. It simply and shockingly merely copied and pasted the three "Good Reason[s]" listed in Section 6 of the Circle Agreement, without explaining in any way how they allegedly applied. The Circle Notice cited: FT Partners' unspecified material breaches of the Circle Agreement and harm to Circle; FT Partners' unspecified conflicts of interest with Circle; and that supposedly neither Mr. McLaughlin nor FT Partners' then-employee Randall Little— whom FT Partners had said were both fully ready, willing, and able to help Circle with any financial advisory needs under the Circle Agreement—was a lead or co-lead banker for the FT Partners team covering Circle. The letter not only failed to specify any alleged facts whatsoever supporting the purported "Good Reasons" for termination but also denied to FT Partners notice of

the supposed circumstances underlying the alleged Good Reasons and a bona fide opportunity to cure within 30 days—which were all fully required by the Circle Agreement.

31.     In fact, none of those supposed Good Reasons had actually occurred (as was necessary for any termination to take effect) and Circle's Board did not act in good faith in concluding that any Good Reason existed to terminate the Circle Agreement.  Further, even if a Good Reason had occurred and Circle's Board had made a good faith determination of such, Circle's Board's failure to identify what the Good Reason(s) supposedly was denied FT Partners a bona fide opportunity to cure, as provided for by the Circle Agreement.

32.     The letter also tellingly failed to explain why Circle had improperly waited at least a year from the time of the fee dispute and its sidelining of Mr. McLaughlin—the likely supposed bases for the Good Reason—to purport to terminate the Circle Agreement, all the while either using or having access to FT Partners' services and creating opportunity costs by, at a minimum, conflicting FT Partners out of other potentially lucrative client relationships.

33.     The purported termination was obviously nothing more than Circle escalating from (i) pretextual efforts to coerce FT Partners into accepting dramatically lower fees to (ii) pretextual efforts to entirely deny FT Partners any and all fees it was owed, or might likely in the future be owed, under the Circle Agreement.  Indeed, on April 12, 2022, just two business days after Circle purported to terminate the Circle Agreement, Circle announced a $401 million Capital Raise, including from investors whom FT Partners had brought into the earlier Convertible Note Financing.[2]  On July 11, 2022, Circle publicly disclosed that it had in fact closed this Capital Raise on May 9, 2022 ("May 2022 Capital Raise").

---

[2]     https://www.circle.com/en/pressroom/circle-announces-400m-funding-round.

34.     This timing of the May 2022 Capital Raise confirms that the purported termination on April 8, 2022 was an obvious, last-minute, ill-conceived attempt—not made in good faith by Circle's board—by Circle to avoid paying FT Partners not only a Company Sale fee for the then-pending Acquisition but also a fee for this additional financing, which squarely constitutes a Capital Raise and entitles FT Partners to a fee of $28.07 million under the Circle Agreement.

35.     Even though Section 2(e) of the Circle Agreement obligated Circle to pay FT Partners the Capital Raise fee "simultaneously with, or prior to, the consummation of the Transaction," Circle did not do so.  On August 19, 2022, FT Partners sent Circle an invoice reminding Circle of its obligation to pay FT Partners the $28.07 million Capital Raise fee.  To date, Circle has improperly refused to pay that fee and the associated monthly interest, which has been and continues accruing.

36.     Soon after, Circle further escalated its underhanded tactics.  Specifically, on August 26, 2022, Circle sent FT Partners a letter ("SeedInvest Notice") purporting to terminate the separate SeedInvest Agreement.  As soon became clear, Circle did this because it had re-started its efforts to sell SeedInvest and had begun to negotiate a sale of SeedInvest and therefore might soon have to pay FT Partners a Transaction Fee under the SeedInvest Agreement.

37.     In the SeedInvest Notice, Circle claimed that the Circle Board of Directors had determined that, under Section 6 of the SeedInvest Agreement, "Good Reason[s]" existed to terminate the SeedInvest Agreement.  Circle again simply and shockingly just copied and pasted the three "Good Reason[s]" listed in Section 6, without explaining in any way how they allegedly applied.  These supposed "Good Reason[s]" were:  (i) FT Partners' unspecified conflicts of interest with Circle; and (ii) that neither Mr. McLaughlin nor Mr. Little—both of whom were actively working for Circle until Circle cut them out, and whom FT Partners had made clear were fully

-13-

ready, willing, and able to help Circle and SeedInvest with any financial advisory needs—were supposedly a lead or co-lead banker for the FT Partners team covering SeedInvest. The letter not only failed to specify any alleged facts whatsoever supporting the purported "Good Reasons" for termination, but also denied to FT Partners notice and a period to cure, which were again also required by the SeedInvest Agreement.

38.    As with Circle's purported termination of the Circle Agreement, no Good Reason that would allow termination of the SeedInvest Agreement had actually occurred, and Circle's Board did not have a good-faith basis to conclude otherwise. Instead, the purported termination was nothing more than Circle escalating from (i) pretextual efforts to coerce FT Partners into accepting dramatically lower fees to (ii) pretextual efforts to entirely deny FT Partners any and all fees it was owed, or might in the future be owed, under the SeedInvest Agreement. This was further confirmed by the fact that none of the Defendants had identified any supposed issues with FT Partners' work for SeedInvest, including in the more than four months since Circle purported to have terminated the Circle Agreement.

39.    On October 24, 2022, Circle, Pluto, and SI Securities entered into the so-called Asset Purchase Agreement with StartEngine Crowdfunding, Inc. ("StartEngine") and StartEngine's wholly owned subsidiary Moonshine Acquisition, LLC ("Moonshine"). Under the Asset Purchase Agreement, Pluto and SI Securities sold substantially all of their assets to Moonshine, including all of Pluto's limited liability membership company interests in SeedInvest Technology, in exchange for $24 million in StartEngine stock. This sale (the "SeedInvest Acquisition") plainly constitutes an SI Sale, including because it involves "an acquirer's acquisition of all or at least 50% of the assets, properties, revenue, income or business of SeedInvest."

-14-

40.    Moreover, the timing of this Asset Purchase Agreement, less than two months after Circle purported to terminate the SeedInvest Agreement, further confirms that Circle is not operating in good faith in its attempt to deny FT Partners the fees it is owed.  The purported termination conspicuously made no mention of any potential transaction, despite the fact that the SeedInvest Acquisition was already being negotiated at that time: Circle had entered into a non-disclosure agreement with StartEngine nine days prior to its purported termination of the SeedInvest Agreement.

41.    On December 5, 2022, Circle and Concord announced that they had terminated the planned Acquisition because the U.S. Securities and Exchange Commission ("SEC") had not declared the S-4 registration statement for the Acquisition effective in time to meet Concord's December 10, 2022 deadline to consummate a transaction.  While this means that in fact no Company Sale fee is due to FT Partners for that Acquisition, Circle still owes FT Partners fees for the May 2022 Capital Raise, the SeedInvest Acquisition (which closed on May 5, 2023), and the August 2023 Capital Raise (defined below).  Moreover, the Circle Agreement is still in effect because it has never been validly terminated and only terminates otherwise upon a transaction fitting the definition of a Company Sale.

42.    On November 17, 2023, FT Partners sent Circle an invoice reminding Circle of its obligation to pay FT Partners the SeedInvest Acquisition Transaction Fee and to reimburse the expenses FT Partners incurred in its work for SeedInvest.  To date, Circle has improperly refused to pay that fee and those expenses.

43.    On August 18, 2023, Circle entered into a Capital Raise ("August 2023 Capital Raise") from Coinbase Global, Inc. ("Coinbase").  In this Transaction, Circle sold Coinbase 3.5% of Circle's fully diluted equity, which Coinbase valued at $51.1 million.  In return, Circle received

Coinbase's 50% interest in Centre Consortium LLC, a joint venture that Circle and Coinbase had co-founded in 2018 to promote stablecoins. This Transaction constitutes a Capital Raise because Circle "s[old]" its "equity interests" to Coinbase, and so FT Partners is entitled to 7% of the "gross proceeds" of that sale. Where, as here, those proceeds were in-kind, FT Partners is entitled to 7% of the fair market value that Circle received in the sale, *i.e.*, 7% of $51.1 million. On November 17, 2023, FT Partners sent Circle an invoice reminding Circle of its obligation to pay FT Partners that $3.577 million Capital Raise fee. To date, Circle has improperly refused to pay that fee.

44.    FT Partners has attempted to resolve this dispute amicably with Circle. Circle first mentioned the possibility of a fee dispute in February 2021, and made an offer to resolve that potential dispute in early March 2021—before its term sheet with Concord had been signed. While that offer was far less than FT Partners would be owed once the Acquisition closed, it was many times higher than Circle would later claim FT Partners could be entitled to, thus confirming that Circle understood that the Acquisition would be a Company Sale. But once the term sheet was signed, Circle quickly escalated its attempt to get out of the expected Transaction Fee, first by manufacturing reasons why the Acquisition was not a Company Sale, then by barring Mr. McLaughlin from working on Circle matters in hopes of manufacturing a breach, and then by purporting to terminate the Circle Agreement. Throughout this time, FT Partners continued to assist Circle to the maximum extent that Circle would permit it to and continued to try to sort out this dispute. However, to date, Circle has not been willing to resolve this dispute on equitable terms.

45.    Accordingly, FT Partners brings this action to obtain declaratory relief that the Circle Agreement is still in full force and effect, and for specific performance of Circle's obligations to FT Partners under various provisions of the Circle Agreement. FT Partners also

brings this action to obtain damages—including all fees, expenses, interest, and attorney's fees as provided by the Circle Agreement and the SeedInvest Agreement—for Circle's past and continuing breaches of the Circle Agreement and Defendants' past and continuing breaches of the SeedInvest Agreement.

46.    Circle's position is "heads, we win; tails, you lose."  Circle secured FT Partners' assistance with an ironclad guarantee that FT Partners would be fairly compensated, including that, in the unlikely event that Circle entered into a multi-billion dollar Company Sale, FT Partners would receive a fee of roughly 9%-10% of that amount.  But once Circle achieved a massive valuation, it greedily sought to nullify the parties' arrangement so it would not have to pay fees to FT Partners going forward.  Circle's position is neither consistent with the plain text of the Circle Agreement nor remotely equitable or believable, and can only be explained by its desire to manufacture a loophole to escape the reality that it would likely owe FT Partners substantial success-based fees absent a valid termination.  FT Partners made a risky bet and put its time, energy, and reputation on the line for Circle—following that, it would make no sense for FT Partners to do anything that would risk a breach of the Circle or SeedInvest Agreements. Accordingly, no breach by FT Partners ever occurred. Circle should not be allowed to deny FT Partners the fruits of its efforts and the risky but ultimately successful chance it took on Circle.

## THE PARTIES

47.    Plaintiff Financial Technology Partners L.P. is a limited partnership organized under the laws of Delaware.  Financial Technology Partners L.P.'s general partner is Financial Technology Partners II LLC ("FTP II LLC"), and its limited partners are Cinco de Mayo Holdings LLC ("Cinco LLC") and the Steven J. McLaughlin Revocable Trust ("McLaughlin Trust"). Financial Technology Partners L.P.'s principal place of business is California.   Financial Technology Partners L.P. maintains one of its three offices in New York.

48.    Non-party FTP II LLC is a limited liability company organized under the laws of Delaware.  FTP II LLC has two members: the McLaughlin Trust and Andrew J. McLaughlin.

49.    Non-party the McLaughlin Trust is an express trust created under the laws of Florida.  Its sole trustee is Steven J. McLaughlin, who is a Florida domiciliary and citizen.

50.    Non-party Cinco LLC is a limited liability company organized under the laws of Delaware.  Cinco LLC's sole member is The Cinco de Mayo Trust ("Cinco Trust").  Non-party the Cinco Trust is an express trust created under the laws of Delaware.  The trustees of the Cinco Trust are Andrew J. McLaughlin, John Lawrence Furlong, and administrative trustee The Bryn Mawr Trust Company of Delaware ("Bryn Mawr").

51.    Non-party Andrew J. McLaughlin is a California domiciliary and citizen.  Non-party John Lawrence Furlong is a California domiciliary and citizen.  Non-party Bryn Mawr is a corporation incorporated in Delaware with its principal place of business in Delaware.

52.    Plaintiff FTP Securities LLC is a limited liability corporation organized under the laws of Delaware.  FTP Securities LLC's sole member is Financial Technology Partners L.P.  FTP Securities LLC's principal place of business is California.  FTP Securities LLC maintains one of its three offices in New York.

53.    Defendant Circle Internet Financial Limited is a private company limited by shares incorporated in Ireland.  Circle is a financial technology firm that is the principal developer of USD Coin, a cryptocurrency pegged to the U.S. Dollar, and provides digital currency payments and treasury infrastructure for businesses.  Circle has claimed to be a "remote-first company" that "currently lease[s] office space in Boston, Massachusetts that [it] used as [its] corporate headquarters prior to the COVID-19 pandemic."  Upon information and belief, Circle's principal place of business is Ireland.  As of July 1, 2024, Circle became a wholly owned subsidiary of

Circle Internet Group, Inc. ("Circle US").  Non-party Circle US is a Delaware corporation.  On information and belief, Circle US's principal place of business is Ireland.

54.     Upon information and belief, Defendant Pluto Holdings, LLC is a Delaware limited liability company and indirect wholly owned subsidiary of Circle.  Upon information and belief, Pluto's principal place of business is Massachusetts.  Pluto Holdings, LLC was previously known as Pluto Holdings, Inc.

55.     Upon information and belief, Defendant SeedInvest Technology LLC is a New York limited liability company and indirect wholly owned subsidiary of non-party StartEngine Crowdfunding, Inc.  Before it was purchased by StartEngine, SeedInvest Technology, together with SI Securities and SI Advisors, operated an equity crowdfunding platform that allowed investors to invest in startup companies.  Upon information and belief, SeedInvest Technology's principal place of business is New York.

56.     Upon information and belief, Defendant SI Securities, LLC is a New York limited liability company and wholly owned subsidiary of Pluto.  SI Securities is a FINRA- and SEC-registered broker-dealer.  Upon information and belief, SI Securities' principal place of business is Massachusetts.

57.     Upon information and belief, Defendant SI Advisors I, LLC is a Delaware limited liability company and wholly-owned subsidiary of Pluto.  Upon information and belief, SI Advisors' principal place of business is New York.

## JURISDICTION AND VENUE

58.     Personal jurisdiction over Circle concerning the Circle Agreement is proper in New York because Circle agreed in Section 8 of the Circle Agreement to irrevocably submit to the jurisdiction of the New York State or U.S. Federal Court located in New York County.  That paragraph states in relevant part that:

> The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of and venue in any New York State or United States Federal Court located in New York County for any action or proceeding arising out of or relating to this letter agreement or the matters contemplated hereby and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may and shall be heard in such state or federal court.

59.     Personal jurisdiction over Defendants concerning the SeedInvest Agreement is proper in New York because they agreed in Section 8 of the SeedInvest Agreement to irrevocably submit to the jurisdiction of the New York State or U.S. Federal Court located in New York County.  That paragraph states in relevant part that:

> The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of and venue in any New York State or United States Federal Court located in New York County for any action or proceeding arising out of or relating to this letter agreement or the matters contemplated hereby and the parties hereby irrevocably agree that all claims in respect of such action or proceeding may and shall be heard in such state or federal court.

60.     Personal jurisdiction over SeedInvest Technology and SI Advisors is also proper in New York because they have their principal place of business in New York.  Personal jurisdiction over SeedInvest Technology and SI Securities is also proper in New York because they are incorporated in New York.

61.     Personal jurisdiction over Circle is also proper in New York because it entered into the Circle Agreement, which contains a New York choice-of-law clause, with FT Partners, which is based in part in New York.

62.     Personal jurisdiction over Defendants is also proper in New York because they entered into the SeedInvest Agreement, which contains a New York choice-of-law clause, with FT Partners, which is based in part in New York.

63.     Personal jurisdiction over Defendants is also proper in New York because the SeedInvest Agreement was negotiated, in part, in New York.

64.     Venue in the New York Supreme Court is proper under Section 501 of New York Civil Practice Law and Rules ("CPLR").  Pursuant to Section 8 of the Circle Agreement, Circle consented to venue in any New York State or United States Federal Court located in New York County.  Likewise, in Section 8 of the SeedInvest Agreement, Defendants consented to venue in any New York State or United States Federal Court located in New York County.  Venue is also proper in New York County under CPLR 503, because a substantial portion of the events giving rise to this action occurred in New York.

65.     This action was properly brought in the Commercial Division of the Supreme Court pursuant to Section 202.70 of the Uniform Civil Rules for the Supreme Court and the County Court because it is based on claims for breach of contract seeking equitable and declaratory relief and damages exceeding $500,000.

66.     Venue is not proper in this Court because this Court lacks subject matter jurisdiction over this action.

## FACTS

**A.     Circle's Engagement of FT Partners**

67.     On May 15, 2020, Mr. Allaire, Circle's CEO and founder, proactively approached Steve McLaughlin, FT Partners' CEO, managing partner and founder, about Circle retaining FT Partners to provide Circle with financial advisory services.  Founded more than 20 years ago, FT Partners is a leading investment banking firm focused exclusively on the financial technology sector, and has extensive knowledge and relationships that can be brought to bear on behalf of its clients.  It has acted as the sole strategic and financial advisor for companies in connection with many multi-billion-dollar transactions and has been named an *Investment Bank of the Year* four times since 2004 by The M&A Advisor.  Mr. McLaughlin was ranked #1 on Institutional Investor's 2018 *Most Influential Dealmakers in FinTech* report, named *Investment Banker of the Year* in

-21-

2017, ranked *#1 FinTech Banker in Silicon Valley* by The Information in 2016, and featured on The Information's *New Financial Power Brokers* list in 2023.  Indeed, in the six months leading up to the execution of the Circle Agreement, FT Partners announced that it had helped advise its clients through numerous $100+ million capital raises and multiple company sales and other business combinations, including a $1.7 billion acquisition of a client by a SPAC (which was deemed a Company Sale by that client).

68.    At the time Circle approached FT Partners in early 2020, Circle's situation was extremely grim.  In 2019, Circle had tried and failed to secure a merger or financing partner, despite the involvement of three highly qualified global investment banks: Barclays, Nomura, and China International Capital Corporation.  Circle had almost no revenue, was burning roughly $2 million to $3 million in cash per month, had settlement obligations that could wipe out most of its cash position, and was being investigated by both the SEC and the U.S. Treasury Department's Office of Foreign Assets Control in matters that could bring serious legal exposure.

69.    In fact, Circle's own audited financials stated that, in 2020, "there was substantial doubt of the Company's ability to continue as a going concern."

70.    Recognizing the extreme and ongoing risks to Circle, none of its stockholders—some of whom were represented on Circle's Board—offered to invest a dime of additional funds to save Circle from impending bankruptcy.

71.    For FT Partners to take on a client in such dire straits posed a great and real risk that FT Partners could devote significant time and resources to the exclusion of other potential clients only to never receive advisory fees—which in the investment banking industry are often paid only if and when the company successfully completes a capital raise, company sale, or other transaction.

72.    However, FT Partners has been a pioneer in offering its clients more varied and flexible fee structures than investment banks typically are willing to.  Investment banks (other than those in restructuring engagements) are almost never willing to work for a company that is close to bankruptcy and has a low current valuation given the substantial risk that the company would never enter into a deal that generates a meaningful fee or even any fee.  By contrast, on occasion, FT Partners has been willing to invest substantial time into risky prospects like Circle.  In those agreements, FT Partners' clients frequently agree to a long-term engagement agreement and/or a fee structure that recognizes the substantial risk that FT Partners is taking by providing that, in the event that the company eventually completes a Company Sale at a valuation far higher than its valuation at the time of entering into the long-term engagement agreement, FT Partners' fee for the Company Sale will typically approach or even exceed 5-20% of the aggregate consideration or incremental aggregate consideration in the transaction.

73.    Consistent with this, a May 24, 2020 email from Mr. McLaughlin to Mr. Allaire made clear that the Circle engagement to raise fresh capital or sell would be "tricky" and it was likely not to be a "6 month event," but "a year" or even "2-3 years before a great fee-producing outcome comes along."  Circle understood that to secure FT Partners' highly sought-after services, it would need to agree to terms that provided FT Partners with significant upside—beyond what other advisors might charge a larger, profitable, and well-performing company that had a greater and more imminent likelihood of entering into a transaction and could actually pay its bills.

74.    Circle was well aware of these ongoing and potentially very significant fees, as unlikely as they may have been, as they were extensively negotiated by its own sophisticated officers, Board of Directors, and experienced outside counsel.  FT Partners also made clear that Circle needed to agree that FT Partners would be Circle's exclusive financial and strategic advisor,

-23-

and that the engagement could not be terminated (absent specific "Good Reason" circumstances) until a successful sale or merger that would entitle FT Partners to its full Company Sale fee. This meant that, absent a valid termination for a specified Good Reason, the agreement would remain in place until a Company Sale closed, even if Circle engaged in multiple Capital Raises or alternative transactions that generated fees for FT Partners before that Company Sale. Indeed, Mr. McLaughlin specifically told Mr. Allaire in an email that the "term" of the engagement would be "[l]ifetime / permanent" with "[n]o loopholes." Mr. Allaire clearly understood the demand and responded in an email on May 25, 2020, writing, "I can live with this. Blood brothers. Let's do something great together!" That the engagement would last until a Company Sale was critical to FT Partners because the fees from Capital Raises and/or alternative transactions alone were unlikely to recoup the significant investment of time and resources that FT Partners was making in Circle's success. FT Partners accordingly would not have entered into the Circle Agreement if it was expected to terminate before a Company Sale.

**B.    The Circle Agreement**

75.    On July 1, 2020, FT Partners and Circle entered into the Circle Agreement, which, consistent with the parties' discussions, sets forth the terms and conditions pursuant to which FT Partners would serve as Circle's "exclusive financial and strategic advisor in connection with possible Transactions," and that "FT Partners will be the Company's long-term financial and strategic advisor through a Company Sale." (Circle Agreement, attached hereto as Exhibit A, at § 6.)

76.     Circle negotiated the Circle Agreement with the advice of experienced outside counsel at Goodwin Procter LLP, and Circle's highly sophisticated directors and officers reviewed the Circle Agreement and approved it.[3]

77.     The Circle Agreement is governed by New York law and refers to Circle as the "Company." (*Id.* at intro. & § 8.)

78.     In keeping with the purpose of the Circle Agreement to establish FT Partners as Circle's exclusive and long-term advisor in connection with potential capital raises or the sale or acquisition of Circle, the Circle Agreement contains multiple provisions that evidence this close relationship:

a)   The opening of the Circle Agreement specifically states that FT Partners is being engaged as Circle's "exclusive financial and strategic advisor in connection with possible Transactions." (*Id.* at intro.)   This means that from the date of the Circle Agreement through a Company Sale, FT Partners would be paid on any and all Capital Raise, Company Sale and certain other relevant alternative transactions.

b)   Circle engaged FT Partners to provide a broad range of potential services.  Specifically, Section 1 provides that, during the term of the engagement, "as reasonably requested by the Company and as appropriate, customary and reasonable for the size and scope of Transaction, FT Partners will provide the Company with financial advice and assistance in connection with potential Transactions, which may include assisting the Company in reviewing and analyzing potential Transactions, assisting the Company in

---

[3]     When the Circle Agreement was executed, Circle's Board included: Mr. Allaire, who had founded multiple companies and worked at a venture capital firm, a former CEO, a venture capitalist and attorney, a former company president and founder, a former CEO and co-founder of a venture capital firm, and another venture capitalist.

negotiating Transactions, advising the Company on its preparation for any potential Transaction, as well as any other advisory and investment banking services we mutually deem appropriate."

c) "Transaction" was defined as any "Company Sale" or "Capital Raise," both of which were broadly defined. (*Id.* at Annex B.) Specifically, "Company Sale" was defined to include "any merger, consolidation, restructuring, reorganization, recapitalization, joint venture, exchange or other transaction or analogous event," "whether effected in one transaction or a series of transactions," which involved: (i) the sale of at least 50% of Circle's equity securities; (ii) "the merger or combination of [Circle] with an acquirer"; or (iii) the sale of at least 50% of Circle's "assets, properties, revenue, income or business." (*Id.*) And "Capital Raise" was defined to include any transaction involving the sale of "either (a) equity interests . . . equity-linked interests . . . options, warrants or other rights to acquire equity interests . . . representing less than 50% of [Circle's] capital stock or equivalents or those of any of its subsidiaries or (b) outside of the normal course of business, less than 50% of the assets, properties or business of [Circle] or of any of its subsidiaries, business units or divisions." (*Id.*)

d) Section 2 sets out detailed calculations for FT Partners' fees, which would be earned in connection with Company Sales, Capital Raises, and "alternative transactions" that do not constitute a Company Sale or Capital Raise. Notably, FT Partners earns a percentage of the gross proceeds in a Capital Raise and varying percentages of the aggregate consideration in a Company Sale, in order to incentivize FT Partners to secure the greatest possible value for Circle.

e) Recognizing that FT Partners will be Circle's "long-term financial and strategic advisor," Section 6 contemplates that the engagement will last until the "consummation of a Company Sale." That is, the agreement would remain in effect following any number of Capital Raises or alternative transactions over any extended period of time.

f) Section 6 also permits Circle to provide notice to terminate and potentially effectuate such termination of FT Partners under an extremely narrow set of compounding specified circumstances which must all be met and, even then, Circle must adhere to specific procedures, including providing a sufficiently detailed notice to FT Partners and providing 30 days to cure any purported grounds for termination.

g) Further, Section 6 is explicit that FT Partners is owed its fees for "any Transactions completed during the term of this letter agreement . . . regardless of how much time has elapsed from the date of this letter agreement and without regard for the extent to which the Company actively involves FT Partners in such Transactions." That obligation extends even to certain Transactions completed after certain instances of a valid termination of the Circle Agreement, further demonstrating the intended long-term nature of the Circle Agreement.

h) Sections 7 and 9 secure certain publicity rights for FT Partners, which are of critical value to a company like FT Partners that relies on its reputation to engage future clients.

i) Section 7 also requires Circle to share a wide range of information with FT Partners and to keep FT Partners informed of any material developments concerning Circle or any proposed Transaction.

j) Section 10 of the Circle Agreement provides that it "shall be binding upon the Company, FT Partners and each of their respective successors."

79. Importantly, all of these provisions supported what the parties (including Circle, its CEO, its Board, and its experienced outside counsel) agreed was a "[n]o loopholes" and "blood brothers" agreement in which FT Partners would be entitled to specified fees for agreeing to take on the Circle engagement.

### 1. Calculation of FT Partners' Fees

80. Under the Circle Agreement, Circle agreed to pay FT Partners: (i) quarterly retainer fees; (ii) a "Transaction Fee" for each Company Sale or Capital Raise; (iii) an alternative fee in the event that Circle entered into an "alternative transaction"; and (iv) certain of FT Partners' expenses. (*Id.* § 2.)

81. With respect to the quarterly retainer fees, Section 2(a) provides that "[i]n consideration of the advisory services being provided by FT Partners hereunder, the Company agrees to pay FT Partners a non-refundable retainer (the '**Retainer**') of $50,000 per quarter in advance, with the first such installment payable upon execution of this letter agreement and additional installments payable every three (3) months thereafter. Any Retainer payments, to the extent paid, will be applied against any Transaction Fee (as defined below) that is payable under the terms of this letter agreement within one (1) year of the due date of such Retainer payment."

### a. FT Partners' Fee in the Event of a Company Sale or Capital Raise

82. Under the Circle Agreement, Circle owes FT Partners a Transaction Fee whenever a Company Sale or Capital Raise occurs. In keeping with the purpose of the Circle Agreement and the parties' intentions, the Fees are structured to provide significant upside to FT Partners in the event that a Capital Raise or highly valuable Company Sale occurs.

83. "Transaction" is defined in Annex B of the Circle Agreement to mean:

> the consummation of either of a Company Sale or a Capital Raise. It is contemplated that FT Partners' engagement may involve a series of

transactions; each such transaction shall constitute a Transaction entitling FT Partners to a separate Transaction Fee.

84.    "Company Sale" is defined in Annex B of the Circle Agreement to mean:

whether effected in one transaction or a series of transactions, any merger, consolidation, restructuring, reorganization, recapitalization, joint venture, exchange or other transaction or analogous event involving (a) the sale of all or at least 50% of the issued and outstanding equity securities of the Company to an acquirer where the holders of capital stock of the Company prior to the Company Sale cease to hold a majority of the capital stock following such Company Sale, (b) the merger or combination of the Company with an acquirer or (c) an acquirer's acquisition of all or at least 50% of the assets, properties, revenue, income or business of the Company. A Transaction resulting in the transfer of at least 50% of the Company's voting stock constitutes control and represents a completed Company Sale for purposes of determining when the full Transaction Fee is payable and is to be paid. Nevertheless, FT Partners' advisory efforts pursuant to this letter agreement will continue after control is transferred to assist the Company with a second step merger or similar transaction.

85.    "Capital Raise" is defined in Annex B of the Circle Agreement to mean:

a transaction in which the Company or the Company's stockholders sell to an investor either (a) equity interests (including, without limitation, preferred or common stock), equity-linked interests (including, without limitation, convertible debt, debt with warrants or hybrid capital), options, warrants or other rights to acquire equity interests in the Company (or any of its subsidiaries or any entity formed to acquire the business or assets of the Company) representing less than 50% of the Company's capital stock or equivalents or those of any of its subsidiaries or (b) outside of the normal course of business, less than 50% of the assets, properties or business of the Company or of any of its subsidiaries, business units or divisions. Notwithstanding the foregoing, a sale of existing shares of the Company by a shareholder shall not be considered a Capital Raise if all the following are true of such sale: (i) FT Partners is not involved in any material way in such sale, (ii) such sale is not in conjunction with a Transaction process conducted by the Company, (iii) no materials prepared by or with the assistance of FT Partners are provided to a buyer in such sale, and (iv) the buyer is a party with whom FT Partners has had no material prior contact in regards to a potential Transaction.

86.    For a Company Sale, Section 2(b)(1) states that the Transaction Fee shall be calculated as follows:

In the case of a Company Sale (as defined in Annex B), the Transaction Fee shall be the amount that is the greater of (x) the sum of 3% of the first $400 million (the "First Hurdle") of Aggregate Consideration (as defined in Annex B), plus 6% of any portion of Aggregate Consideration in excess of the First Hurdle up to and including $1 billion (the "Second Hurdle"), plus 10% of any portion of Aggregate Consideration in excess of the Second Hurdle, or (y) $4,000,000 (the "Minimum Fee").

87.    These percentages and hurdles, along with the rest of the terms in the agreement, were heavily negotiated by Circle, a company managed and overseen by sophisticated directors and officers and advised by experienced outside counsel at Goodwin Procter.  This fee structure for a Company Sale clearly contemplated the potential that FT Partners would be paid a significant amount for helping to secure a valuation for Circle of over a billion dollars, let alone many billions of dollars.

88.    Annex B defines Aggregate Consideration as follows:

For purposes of calculating any Transaction Fee in connection with a Company Sale, "**Aggregate Consideration**" shall be, without duplication, the total amount of cash and the fair market value of all securities, directly or indirectly, paid or otherwise distributed to the Company and/or its security holders in their capacity as such (including holders of options, warrants and convertible securities) or affiliates in connection with any Company Sale, including, without limitation the following: (i) cash; (ii) notes, securities and other property valued at the fair market value thereof (determined without any discount for restrictions on the free marketability of such property, including without limitation restrictions on transfer under applicable law or pursuant to an agreement, vesting or repurchase rights); (iii) liabilities, including all debt, pension liabilities, guarantees and working capital deficit assumed (or that remain outstanding), refinanced or extinguished (less any cash and cash equivalents of the Company at the time of the Company Sale conveyed to the acquirer); (iv) payments to be made in installments, if as and when actually received; (v) amounts paid or payable under management compensation plans in excess of market terms; (vi) amounts paid or payable in connection with any pre-Transaction Company employee retention programs; (vii) if the Company Sale involves the sale or disposition by the Company of assets, the net value of any assets not sold by the Company, unless FT Partners is retained following the close of the Company Sale to advise the holders of such retained assets in connection with their eventual sale; and (viii) if the Company Sale takes the form of a recapitalization, restructuring or similar transaction, the fair market value of equity securities of the acquired

company retained by the acquired Company's security holders upon consummation of such Company Sale (such securities and all other securities received by such security holders being deemed to have been paid to such security holders in such Company Sale). Aggregate Consideration shall not be reduced by the amount of any Transaction Fee or any other expense of the Company incurred in connection with the Company Sale. Aggregate Consideration shall also include, without duplication, the aggregate amount of any (i) dividend or other distributions declared by the Company with respect to its stock after the date hereof, other than normal recurring cash dividends in amounts not materially greater than currently paid, and (ii) amounts paid by the Company to repurchase any securities of the Company outstanding on the date hereof, other than repurchases in the ordinary course of business following an employee's separation from employment. Non-cash consideration shall be valued as follows: (x) publicly traded securities shall be valued at the average of their closing prices (as reported by the primary trading exchange for such securities) for the five trading days prior to the closing of the Company Sale, and (y) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company's board of directors and FT Partners on the day prior to the consummation of the Company Sale. Amounts paid into escrow and contingent payments made in connection with any Company Sale will be included as part of the Aggregate Consideration only to the extent paid to the Company and/or its security holders in their capacity as such. If the Aggregate Consideration in connection with a Company Sale may be increased by payments contingent upon the achievement of earnings, revenue or other performance-related targets, the Transaction Fee related to such portion of the Aggregate Consideration shall be payable to FT Partners upon receipt by the Company or the selling shareholders of such portion of the Aggregate Consideration. If the receipt of such incremental Aggregate Consideration causes the cumulative Aggregate Consideration to exceed any previously unreached Transaction Fee hurdle, the cumulative Transaction Fee due hereunder shall be recalculated, and the amount due in connection with such newly received incremental Aggregate Consideration shall be the amount by which such cumulative Transaction Fee exceeds the amount of actual Transaction Fee paid to date. In connection with a Company Sale involving the sale of less than 100% of the outstanding voting equity securities of the Company, the Transaction Fee will be payable and calculated under the definition of Aggregate Consideration set forth above as though 100% of the Company's outstanding voting equity securities on a fully diluted basis had been acquired or sold for the same per share amount paid in the Company Sale in which less than 100% of the Company's outstanding voting stock is acquired by an acquirer or group of affiliated acquirers.

89.     For a Capital Raise, Section 2(b)(ii) states that the "the Transaction Fee shall be 7% of the gross proceeds of the Capital Raise."

90.     Section 2(e) of the Circle Agreement specifies that any fee (including for a Company Sale or Capital Raise) (i) was due upon "consummation of the transaction"; (ii) would begin accruing interest as of that date, unless Circle contested payment in good faith; and (iii) was to be paid entirely in cash, unless FT Partners opted to receive some portion of it in securities (if any of the consideration Circle received was in securities):

> The Company will pay, or will instruct the acquirer to pay, all fees and expenses payable to FT Partners pursuant to this letter agreement simultaneously with, or prior to, the consummation of the Transaction. In the event the Company or an acquirer fails to timely pay the fees and expenses of FT Partners due hereunder at the times described herein, the unpaid fees and expenses due to FT Partners shall bear interest at the rate of two percent (2%) per month, or the highest rate permitted by law if less, until paid in full, unless the payment of the fees or expenses is contested in good faith by the Company. The Company agrees that all payments to be made to FT Partners shall be made by wire, ACH or check in United States dollars to account instructions to be provided by FT Partners; provided, however that if some or all of the consideration to the Company or its stockholders in a Transaction is in the form of securities, FT Partners may, at its sole discretion, elect to receive any portion or all of any related Transaction Fee in such securities in lieu of cash.[4]

### b.     FT Partners' Fee in the Event of an Alternative Transaction

91.     The Circle Agreement also provided that FT Partners would receive a fee if Circle entered into an "alternative transaction," *i.e.*, one that specifically did not fit into the definition of either a Capital Raise or a Company Sale, and FT Partners assisted on such alternative transaction. Such alternative transactions could include, for example, transactions where the Company engaged in buying assets or buying another company, going through a bankruptcy process, or taking on a loan.

---

[4]     Circle has incorrectly stated in its SEC disclosures, including in a preliminary S-4 filed on August 31, 2022, that it "may pay [FT Partners] in cash or equity or a combination thereof." In reality, only FT Partners gets to choose whether to receive its fees in cash or equity.

92.    Section 2(d) provides that the fee for an alternative transaction shall be calculated as follows:

> If, in lieu of a Transaction, the Company completes an alternative transaction with the assistance of FT Partners, FT Partners and the Company will negotiate in good faith the appropriate compensation for FT Partners, which will take into account, among other things, the custom and practice among investment bankers in similar size and type of transactions.

93.    Under Section 6, in the event of an alternative transaction (and also in the event of a Capital Raise), the Circle Agreement would remain in effect.

### c.    Other Provisions

94.    In addition to providing for fee payments by Circle to FT Partners, Section 3 of the Circle Agreement provides that Circle will reimburse FT Partners "for FT Partners' reasonable and documented out-of-pocket expenses (including . . . the reasonable and documented fees and disbursements of external legal counsel) arising in connection with any matter referred to in this letter agreement."

95.    Section 10 of the Circle Agreement provides that "[e]ach party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled in connection with any action to enforce this letter agreement."

96.    Section 7 of the Circle Agreement also requires Circle to provide FT Partners with the information FT Partners needs to carry out its activities under the Circle Agreement, including its calculation of the Transaction Fee:

> The Company shall furnish FT Partners with all information and data that FT Partners shall reasonably deem appropriate in connection with FT Partners' activities on the Company's behalf and shall provide FT Partners reasonable access to the Company's officers, directors, employees, accountants, auditors and other professional advisors. The Company agrees to promptly advise FT Partners of all developments materially affecting the Company or any proposed Transaction. The Company will promptly notify FT Partners if it learns of any material inaccuracy or misstatement in, or material omission from or change in, any information provided to FT

Partners. The Company shall, upon any Transaction closing or upon request, promptly furnish to FT Partners a complete set of final documents (execution copies) governing such completed Transaction for retention in FT Partners' internal records. The Company shall also promptly furnish to FT Partners, upon request, any documentation FT Partners may reasonably request in order to calculate the Transaction Fee due hereunder.

**2.      Term and Termination**

97.      Circle agreed in Section 6 that (except as discussed below) the Circle Agreement would not end until the "consummation of a Company Sale," and that FT Partners would receive a Transaction Fee for any Transaction that occurred during the term of the Circle Agreement:

> With the commencement of this letter agreement, it is anticipated that FT Partners will be the Company's long-term financial and strategic advisor through a Company Sale, and the term of this letter agreement will commence on the date hereof and end upon the earlier of consummation of a Company Sale or earlier termination of this letter agreement as provided below, except as otherwise agreed by the parties. For the avoidance of doubt, this letter agreement shall not automatically terminate upon the consummation of any Capital Raise. **For further avoidance of doubt, any applicable Transaction Fees with respect to any Transactions completed during the term of this letter agreement will be payable to FT Partners in accordance with Section 2 of this letter agreement regardless of how much time has elapsed from the date of this letter agreement and without regard for the extent to which the Company actively involves FT Partners in such Transactions.**

> (Emphasis added.)

98.      In keeping with the long-term, exclusive nature of Circle's and FT Partners' intended relationship, Section 6 also provided that Circle could only terminate the Circle Agreement prior to a Company Sale under certain highly limited and extreme circumstances that would presumably materially harm Circle:

> [T]he Company may immediately terminate this letter agreement for the following (each a "Good Reason") if the Board of Directors of the Company notifies FT Partners that the Board has determined in good faith that: (a) FT Partners has materially breached its obligations under this letter agreement causing or likely to cause material harm to the Company, (b) that FT Partners or its affiliates has a conflict of interest materially detrimental to the Company that has not been waived by the Company, or (c) if for any

reason neither Steven J. McLaughlin nor Randall Little are the lead or co-lead advisors for FT Partners representing FT Partners and actively involved in any prospective Transaction. A termination for Good Reason shall only be effective if FT Partners has, to the extent curable, failed to cure such Good Reason in the good faith determination of the Board of Directors of the Company within thirty (30) days after the Company has provided written notice of such Good Reason to FT Partners. Following the termination of this letter agreement for Good Reason in accordance with clause (c) above, FT Partners will be entitled to any applicable Transaction Fee if, within twelve (12) months of the effective date of such termination (the "**Tail Period**"), the Company consummates or enters into any agreement that subsequently results in any Transaction.

99.     Thus, Circle may only terminate the Circle Agreement, and that termination "shall only be effective," if the following preconditions are met: (i) one or more of the three specified Good Reasons has, in fact, occurred; (ii) Circle's Board then makes a good-faith determination that a Good Reason has occurred; (iii) Circle timely gives FT Partners written notice that Circle's Board has determined in good faith that "such Good Reason" exists, and that notice provides FT Partners with sufficient information concerning the specified Good Reason to allow FT Partners to determine whether it can cure the Good Reason and how to cure the Good Reason; (iv) if curable, FT Partners does not cure the Good Reason within 30 days of notice; and (v) if curable, Circle's Board then determines in good faith that FT Partners has failed to cure such Good Reason within 30 days.

100.    The requirement that Circle give notice of the purported Good Reason, combined with the requirement that FT Partners be given a chance to cure any curable Good Reason, plainly means that the notice must provide FT Partners sufficient and timely information about a valid Good Reason(s) so that it can proactively attempt to cure those valid Good Reason(s). FT Partners' ability to cure a supposed valid Good Reason would be meaningless if Circle could simply assert that a Good Reason had occurred without explanation or if Circle could delay giving notice until a Good Reason was no longer curable.

101.    The Circle Agreement also specifies that "[t]he provisions of paragraphs 3 (Expenses), 5 (Indemnification), 7(b), (c) and (d) (Cooperation), 8 (Jurisdiction) and 10 (Miscellaneous), as well as Annex A and, to the extent of any post-closing Aggregate Consideration, paragraph 2 (Fees) and Annex B, shall survive any termination or expiration of this letter agreement." (*Id.* § 6.)

### 3.    Publicity and Announcements

102.    It is important for financial advisors to be able to publicize the work they do for their clients.  Such publicity helps generate additional business by highlighting for the relevant market the advisor's capabilities.

103.    Recognizing the importance to FT Partners of publicizing its work for Circle, Section 9 of the Circle Agreement requires that "any press release [Circle] may issue (jointly with an acquirer or solely) announcing a Transaction will contain a reference to FT Partners' role as exclusive financial and strategic advisor to the Company and its Board of directors in connection with such Transaction."

104.    Section 9 also allows FT Partners to, "at its option and expense, place an announcement in such newspapers, electronic media and periodicals as it may choose, stating that FT Partners has acted as the exclusive financial and strategic advisor to the Company in connection with any Transaction or alternative transaction in which it is involved."  The Circle Agreement gives Circle the "right to approve such announcement in advance, such approval not to be unreasonably withheld or delayed."

105.    Section 7(a) of the Circle Agreement also sets forth that "[i]n the event the Company is required by law to make any filings with any governmental authority or any disclosure to any third party, including without limitation the security holders of the Company, which

mentions FT Partners or the advice rendered by FT Partners hereunder, such disclosure shall be in a form and substance satisfactory to FT Partners and its counsel, in their sole discretion."

106.    Circle, including its Board, was thus fully aware from day one what the parties' agreement was.  Given its poor prospects for finding a Capital Raise or a Company Sale counter-party that would be willing to value it at even a few hundred million dollars, Circle was happy to structure the deal so that much of FT Partners' overall compensation could come in the highly unlikely event that Circle was eventually sold at a multi-billion dollar valuation.  *First*, Circle agreed that if a Company Sale at a substantial multi-billion valuation ever occurred, then FT Partners would be fully entitled to roughly 9%-10% of the entire Company Sale amount.  *Second*, Circle knew that this would be an "above-market" fee had this been a situation where success was likely at the signing of the agreement, but nonetheless agreed to it in order to secure FT Partners' specialized expertise for Circle.  *Third*, Circle committed to paying this potentially substantial fee—should a Company Sale at a multi-billion dollar valuation occur—regardless of the circumstances.  Specifically, it would make no difference when the Company Sale occurred, how many transactions Circle entered into before the Company Sale occurred, and whether FT Partners even was requested to work on the specific deal that culminated in that Company Sale.  *Fourth*, Circle knew that the Circle Agreement would remain in effect until either a Company Sale occurred or Circle terminated the agreement for one of three extremely narrow and specified "Good Reason[s]."  Therefore, even if FT Partners received substantial fees for numerous Capital Raises or alternative transactions, FT Partners would still be entitled to a separate fee if and when a Company Sale occurred, absent a valid termination for a specified Good Reason.  Circle knew and happily accepted all of this when it needed FT Partners' help and referred to the parties as "blood brothers."

**C.    Additional Financing for Circle**

107.    Given Circle's substantial risk of bankruptcy due to its continued losses, limited cash on hand, and legal problems, FT Partners began its work even before the Circle Agreement was executed on July 1, 2020 by starting to help Circle raise additional financing.

108.    Out of the gate, FT Partners undertook extensive efforts to find investors willing to throw Circle a lifeline.    FT Partners' work included, among numerous other activities: (i) contacting more than 150 potential investors; (ii) creating more than 20 unique presentations with hundreds of slides; (iii) managing a virtual data room that allowed potential investors to review relevant Circle documents and conduct due diligence; (iv) creating a detailed financial model that Circle adopted as its internal model; and (v) hosting a global webinar to promote Circle and conducting additional outreach based on attendees.

109.    Leveraging FT Partners' efforts, Circle managed to secure $25 million in Debt Financing in July 2020 and $440 million of Convertible Note Financing in May 2021.[5]    These transactions were instrumental in stabilizing Circle's financial position.    The $440 million Convertible Note Financing (which closed in May 2021 but was largely finalized by early March 2021) played a crucial role in demonstrating Circle's financial turnaround and value as an acquisition target because it had attracted more investors than there was room for, including prominent investors such as Fidelity Management and Research Company and Marshall Wace. Confirming this, in a March 5, 2021 email, Mr. Allaire, Circle's CEO, lauded the value of the

---

[5]    These financings constituted an alternative transaction and a Capital Raise, respectively, under the Circle Agreement, and Circle appropriately paid FT Partners for each one.  For the avoidance of doubt, FT Partners is not alleging that Circle breached the Circle Agreement with respect to the Debt Financing, or with respect to the Transaction Fee Circle owed FT Partners for the Convertible Note Financing.

"over-subscribed" $440 million financing and "big names signing on." Likewise, Circle's own audited financials state that "there was substantial doubt of the Company's ability to continue as a going concern, but that substantial doubt has since been resolved through the issuance of convertible notes," "as of May 2021," *i.e.*, the Convertible Note Financing.

**D.  Circle Is So Happy with FT Partners' Work and Engagement Letter That It Expands the Relationship**

110.    Circle was so happy with the work FT Partners did in helping save Circle following the July 1, 2020 execution of the Circle Agreement that Circle entered into a September 19, 2020 engagement for FT Partners to act as financial advisor to Circle in Circle's attempt to conduct a company sale or capital raise for Circle's subsidiary SeedInvest. The terms of the governing engagement letter ("SeedInvest Agreement") were materially similar to the terms of the Circle Agreement, confirming that Circle was indeed happy with the all of the terms of the Circle Agreement that had already been in place for months.

111.    Because the SeedInvest Agreement's terms are materially similar to those of the Circle Agreement, FT Partners will reference only the most relevant provisions and important differences here.

112.    Like the Circle Agreement, the SeedInvest Agreement is governed by New York law and refers to Circle as the "Company." (SeedInvest Agreement, attached hereto as Exhibit B, at intro. & § 8.)

113.    Like the Circle Agreement, Section 10 of the SeedInvest Agreement provides that it "shall be binding upon the Company, FT Partners and each of their respective successors."

114.    Like the Circle Agreement, Defendants agreed to pay FT Partners: (i) quarterly retainer fees (here, $25,000); (ii) a "Transaction Fee" for each SI Sale or SI Capital Raise; (iii) an

alternative fee in the event that Circle entered into an "alternative transaction"; and (iv) certain of FT Partners' expenses. (*Id.* § 2.)

115.    The fee provisions in the Circle Agreement and the SeedInvest Agreement were heavily negotiated.  The specific hurdles for an SI Sale (the SeedInvest Agreement's version of a Company Sale) were different, and the percentages substantially higher, than those in the Circle Agreement:

> In the case of a SI Sale (as defined in Annex B), the Transaction Fee shall be the sum of (x) $1,500,000, (y) 6% of any portion of Aggregate Consideration (as defined in Annex B) in excess of $25,000,000, up to and including $40,000,000, and (z) 15% of any portion of Aggregate Consideration in excess of $40,000,000; provided, however, that if the acquiring entity in a SI Sale is FT Partners or an affiliate thereof, the Transaction Fee shall be $1,000,000 plus any additional amount determined at the sole discretion of the Company.

116.    Like the Circle Agreement, Section 3 of the SeedInvest Agreement also provides that Circle will reimburse FT Partners "for FT Partners' reasonable and documented out-of-pocket expenses (including client background checks and the reasonable and documented fees and disbursements of external legal counsel) arising in connection with any matter referred to in this letter agreement."

117.    Like the Circle Agreement, Section 7 of the SeedInvest Agreement also requires Circle to "promptly furnish to FT Partners, upon request, any documentation FT Partners may reasonably request in order to calculate the Transaction Fee due hereunder."

118.     Like the Circle Agreement, Section 10 of the SeedInvest Agreement also provides that "[e]ach party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled in connection with any action to enforce this letter agreement."

119.    Like the Circle Agreement, Circle agreed that the SeedInvest Agreement would remain in effect until either a SI Sale had been completed or Circle terminated the agreement for one of three extremely narrow and specified "Good Reason[s]."

120.    Like the Circle Agreement, the SeedInvest Agreement's termination provisions also recognized the exclusive and long-term nature of the relationship between FT Partners and Circle.  Specifically, Section 6 provides:

> With the commencement of this letter agreement, it is anticipated that FT Partners will be the Company's long-term financial and strategic advisor through a SI Sale, and the term of this letter agreement will commence on the date hereof and end upon the earlier of consummation of a SI Sale or earlier termination of this letter agreement as provided below, except as otherwise agreed by the parties. For the avoidance of doubt, this letter agreement shall not automatically terminate upon the consummation of any SI Capital Raise. For further avoidance of doubt, any applicable Transaction Fees with respect to any Transactions completed during the term of this letter agreement will be payable to FT Partners in accordance with Section 2 of this letter agreement regardless of how much time has elapsed from the date of this letter agreement and without regard for the extent to which the Company actively involves FT Partners in such Transactions.

121.    That Section also provides:

> [T]he Company may immediately terminate this letter agreement for the following (each a "**Good Reason**") if the Board of Directors of the Company notifies FT Partners that the Board has determined in good faith that: (a) FT Partners has materially breached its obligations under this letter agreement causing or likely to cause material harm to the Company, (b) that FT Partners or its affiliates has a conflict of interest materially detrimental to the Company that has not been waived by the Company, or (c) if for any reason neither Steven J. McLaughlin nor Randall Little are the lead or co-lead advisors for FT Partners representing FT Partners and actively involved in any prospective Transaction. A termination for Good Reason shall only be effective if FT Partners has, to the extent curable, failed to cure such Good Reason in the good faith determination of the Board of Directors of the Company within thirty (30) days after the Company has provided written notice of such Good Reason to FT Partners. Following the termination of this letter agreement for Good Reason in accordance with clause (c) above, FT Partners will be entitled to any applicable Transaction Fee if, within twelve (12) months of the effective date of such termination (the "**Tail Period**"), the Company consummates or enters into any agreement that subsequently results in any Transaction.

122.    Thus, Circle may only terminate the SeedInvest Agreement, and that termination "shall only be effective," if the following preconditions are met: (i) one or more of the three specified Good Reasons has, in fact, occurred; (ii) Circle's Board then makes a good-faith determination that a Good Reason has occurred; (iii) Circle timely gives FT Partners written notice that Circle's Board has determined in good faith that "such Good Reason" exists, and that notice provides FT Partners with sufficient information concerning the specified Good Reason to allow FT Partners to determine whether it can cure the Good Reason and how to cure the Good Reason; (iv) if curable, FT Partners does not cure the Good Reason within 30 days of notice; and (v) if curable, Circle's Board then determines in good faith that FT Partners has failed to cure such Good Reason within 30 days.

123.    The requirement that Circle give notice of the purported Good Reason, combined with the requirement that FT Partners be given a chance to cure any curable Good Reason, plainly means that the notice must provide FT Partners sufficient and timely information about a valid Good Reason(s) so that it can proactively attempt to cure those valid Good Reason(s). FT Partners' ability to cure a supposed valid Good Reason would be meaningless if Circle could simply assert that a Good Reason had occurred without explanation or if Circle could delay giving notice until a Good Reason was no longer curable.

124.    Finally, like the Circle Agreement, the SeedInvest Agreement specifies that "[t]he provisions of paragraphs 3 (Expenses), 5 (Indemnification), 7(b), (c) and (d) (Cooperation), 8 (Jurisdiction) and 10 (Miscellaneous), as well as Annex A and, to the extent of any post-closing Aggregate Consideration, paragraph 2 (Fees) and Annex B, shall survive any termination or expiration of this letter agreement." (*Id.* § 6.)

E.      **Special Purpose Acquisition Companies and Concord**

125.    SPACs—also known as "blank check" companies—are investment vehicles that raise funds and become a publicly traded company.  As Circle's transactional law firm has explained publicly, SPACs "are formed to raise capital in an initial public offering ('IPO') with the purpose of using the proceeds from the IPO to *acquire* an unspecified business after the IPO."[6] This process is often accompanied by a private investment in public equity ("PIPE") financing.

126.    SPAC transactions are widely recognized by market participants as acquisitions. For example, in its *SPAC Market 2021 Year-In-Review*, Citi refers to companies like Circle as "acquisition targets" and to "SPACs acquiring [their] targets."  Likewise, the American Bar Association has noted that "[d]e-SPAC Transactions are fundamentally merger and acquisition ('M&A') transactions."[7]

127.    By the end of 2019, SPAC transactions were well known and increasingly common. *See 'SPAC' No Longer A Four-Letter Word On Wall Street*, Forbes (Jan. 15, 2020) ("In 2019, there were 59 SPAC listings on Nasdaq and the New York Stock Exchange (NYSE), raising $13.48 billion, compared to 46 listings at $10.77 billion in 2018 . . . ."),

---

[6]    Jeffrey A. Letalien, *SPAC Business Combinations: An Alternative to Traditional IPOs,* (Sept. 22, 2021), https://www.goodwinlaw.com/-/media/images/publications/attorney-articles/cover_letalien_rscr_92221.pdf (emphasis added); *see also Comment Letter to SEC re: Special Purpose Acquisition Companies, Shell Companies and Projections*, Goodwin Proctor LLP, at 39 (June 13, 2022), https://www.sec.gov/comments/s7-13-22/s71322-20131322-301503.pdf ("SPACs are formed to identify, acquire and operate a Target through a business combination").

[7]    *Comment Letter to SEC re: Special Purpose Acquisition Companies, Shell Companies and Projections*, Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association, at 3 (June 17, 2022), https://www.sec.gov/comments/s7-13-22/s71322-20131981-302447.pdf.

https://www.forbes.com/sites/mergermarket/2020/01/15/spac-no-longer-a-four-letter-word-on-wall-street/?sh=37fc949a1126.

128.    Concord is one such SPAC and was incorporated on August 20, 2020 in Delaware. According to Concord's prospectus, it was "formed for the purpose of effecting a *merger*, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses" and "intend[ed] to capitalize on the ability of our management team and Sponsor to identity, *acquire* and manage a business in the financial services and financial technology sectors."  (Emphasis added.)

129.    On December 10, 2020, Concord completed its own IPO of 27,600,000 units sold at an offering price of $10.00 per unit, which generated gross proceeds of $276,000,000. Simultaneously, Concord consummated the sale of 752,000 private units at $10.00 to generate an additional $7.52 million.  As of that time, as is typical for a SPAC, Concord stated that it had not yet identified which private company it would acquire or merge with, nor had it initiated any substantive discussions with a potential target.

**F.    FT Partners Secures Concord as a Potential Acquirer for Circle**

130.    Given Circle's financial condition in late 2020 and early 2021, finding a company willing to acquire Circle—let alone one willing to do a transaction that valued Circle at a base valuation of $4.5 billion (before any earnout payments), a figure that would ultimately grow to $9 billion (before any earnout payments)—was no easy matter.  Most investors saw Circle as worth far less—of the 100+ firms FT Partners contacted in 2020, none was willing to take a lead investor role in a deal that would value Circle at even $300 million.

131.    Despite all this, FT Partners embraced the daunting challenge of finding a company willing to acquire Circle.  FT Partners thus began reaching out to a large number of potential

investors, acquirers, and merger partners, including SPACs, to achieve the best possible outcome for Circle.

132.    During this outreach period, on January 15, 2021, an FT Partners employee sent a presentation titled "Process Update" to Circle.  The presentation included a number of SPACs (including Concord) that had been incorporated into FT Partners' outreach plan and noted that FT Partners "is mapping out the landscape and will begin to engage appropriate parties."

133.    Ultimately, FT Partners identified and reached out to at least 30 SPACs—including the only two SPACs that submitted term sheets for a potential transaction (Concord was one of them).  FT Partners also conducted extensive outreach to and met with other types of potential investors, acquirers, and merger partners.

134.    To support this outreach, FT Partners managed or otherwise played a significant role in a large number of workstreams to prepare materials for potential investors, acquirers, and merger partners, including: (i) marketing materials such as investor presentations; (ii) Circle's public company model and management case model; (iii) Circle's reporting metrics and financial statement presentations; (iv) quality of earnings reports; (v) the Form S-4 registration statement required to be filed with the SEC; (vi) a promotional video; and (vii) work plans for other advisors.

135.    FT Partners also allayed Mr. Allaire's concern that Circle might need 12 months to get operationally ready to comply with the requirements of being a public company by advising that other companies had been able to complete the process in far less time.

136.    As noted above, one of the SPACs that FT Partners specifically identified was Concord.  FT Partners' efforts were crucial in creating the opportunity for a realized transaction between Circle and Concord.  Notably, Concord was a party that was known to FT Partners, but was fully unknown to Circle and vice versa.

137.    FT Partners had a long-standing relationship with some of Concord's principals, which gave Circle credibility it otherwise would not have had with Concord.  Mr. McLaughlin had worked with Peter Ort, a Concord board member, at Goldman Sachs in the late 1990s.  And in 2007, FT Partners had advised on the highly successful billion-dollar sale of a company founded by Henry Helgeson, a Concord advisor.  Moreover, on August 27, 2020, just a week after it was incorporated, Concord reached out to Mr. McLaughlin to let him know that, in the near future, Concord would be looking to acquire a private company and was particularly interested in the financial technology and blockchain space.

138.    It was FT Partners that first reached out to Concord regarding Circle.  Specifically, on January 22, 2021, an FT Partners employee contacted Concord's CEO and a Concord director to discuss the idea of Concord acquiring Circle.

139.    On January 28, 2021, FT Partners spoke with Concord about Circle, after which FT Partners sent a presentation about Circle to Concord and offered to set up an introduction between Concord and Circle.

140.    On February 2, 2021, Circle, Concord, and FT Partners joined a videoconference to discuss a possible acquisition.  Later that day, Concord called FT Partners, expressing that Concord was excited about the opportunity and enthusiastically pitching Concord as a potential acquirer.

141.    These initial efforts culminated in Concord and Circle signing a non-disclosure agreement on February 10, 2021 to facilitate the sharing of information between the two companies.

-46-

142.    On February 28, 2021, after extensive financial modeling and negotiation, FT Partners provided a template term sheet to Concord, including an earnout example that FT Partners created.

### G.    FT Partners Persuades Concord to More Than Double Its Bid

143.    On March 1, 2021, Concord notified FT Partners that it would submit a term sheet valuing Circle at $2 billion, and that this was the maximum Concord could and would pay.

144.    In response, Mr. McLaughlin called Mr. Helgeson that same day, described the merits of Circle's business and the competitive dynamics, explained why a $2 billion valuation was a "non-starter," and pressed Concord to propose a term sheet: (i) valuing Circle at $4-5 billion; and (ii) adding an earnout structure—*i.e.*, additional payments to Circle's stockholders (in the form of additional TopCo shares) should TopCo's share price reach certain targets—that would be highly beneficial to Circle's stockholders.

145.    The next day, as a result of Mr. McLaughlin's negotiations, Concord provided Circle and FT Partners a draft term sheet valuing Circle at $4.5 billion, with the potential for additional significant earnout payments potentially in the billions of dollars.

146.    FT Partners continued to negotiate the term sheet even more vigorously thereafter. On March 3, 2021, Mr. McLaughlin sent an email to Circle proposing changes to the term sheet that were materially favorable to Circle.  Mr. Allaire sent an email to Circle's Board noting that he had asked Mr. McLaughlin to work with Circle's counsel to "get there on something that we would be comfortable signing, while Steve [McLaughlin] works the open issues directly with Concord."

147.    On March 5, 2021, FT Partners advised Circle that the earnout proposed by Concord was too low and that if Circle accepted Concord's proposed earnout term, Circle should "get $1bn extra in purchase price."  Mr. Allaire once again entrusted the deal to Mr. McLaughlin, asking him to "reach out to them ahead of our board call and socialize that we want to refine the

earnout."  Later that day and after additional negotiation, Mr. Allaire asked Mr. McLaughlin to "get on the phone and try to close this out."  Concord returned with a revised term sheet, but Mr. McLaughlin advised that the proposed terms could still be "push[ed] back on."  After an additional discussion between Mr. Allaire and Concord, on March 6, 2021, Concord returned with earnout terms Mr. Allaire was "comfortable with moving forward with."  Concord and Circle signed a non-binding term sheet on March 6, 2021.

148.    FT Partners' negotiations and advice resulted in Concord more than doubling its bid for Circle.  Concord shared with FT Partners that it had originally contemplated a $1.5 billion valuation, and, as noted above, was on the brink of submitting a term sheet containing a $2 billion valuation.  The end result—a $4.5 billion valuation before potential additional earnout payments— reflects an additional $2.5 billion to $3 billion in increased enterprise value over what Concord offered (not including billions of dollars in potential earnout payments).

149.    Further, FT Partners added significant incremental value by generating ideas that no one else—including Circle's management, Board, and attorneys—had conceived.  For example, FT Partners also negotiated other key terms of the transaction with Concord amounting to an additional $400 million to $600 million for each subsequent $2 increase in share price of the future entity through, among other elements, the earnouts described above.  By themselves, the earnouts negotiated by FT Partners would have been worth more than $10 billion for Circle's stockholders—***above and beyond*** the $4.5 billion valuation—if TopCo had achieved in the next 10 years the $100 per share valuation Circle's management repeatedly asserted it would achieve.  Notably, these earnouts were proposed and negotiated solely by FT Partners, which secured them over Concord's objections.

150.    FT Partners likewise negotiated a change to the share dilution caused by the issuance of shares to Concord's sponsors—making it pro rata across Circle's entire cap table rather than solely burdening Circle's existing equity holders—that was "worth tens of millions."  FT Partners also suggested a material change to the way in which the purchase price in the term sheet treated cash on Circle's balance sheet that amounted to many hundreds of millions of dollars or more in additional value to Circle.

151.    Before its sudden about-face, described below, Circle clearly and openly recognized the exceptional value that FT Partners had added at every step in the engagement.  For example, Mr. Allaire praised the Concord deal as an "excellent outcome" in a March 6, 2021 email.  And during a videoconference on March 4, 2021, even after the fee dispute arose, Mr. McLaughlin asked Mr. Allaire, in front of a Circle Board member whether Mr. Allaire believed FT Partners had added value in excess of the fees of over $400 million to which FT Partners was entitled due to the Company Sale to Concord.[8]  Mr. Allaire responded with a resounding "Yeah, I do – I think you added that."  The Circle Board member, a senior partner at a prominent venture capital firm, separately referred to Mr. McLaughlin as "one of the best negotiators I've ever seen."

152.    Likewise, in a March 8, 2021 email, Mr. Helgeson of Concord reached out to Mr. Allaire and stated that: "Steve [McLaughlin], Randy [Little, Managing Director at FTP Partners] and the FT team did a hell of a job on this deal" and that they "successfully defended [their] title as the kings of Fintech investment banking with this deal."  He added that he "was pretty excited when [he] thought that we'd get this done for $2B," but that "[u]nfortunately for

---

[8]    This approximately $400 million was based on Circle's then-current valuation of $4.5 billion, which subsequently increased to $9 billion.

me, FT Partners just wasn't going to let that happen" and that he "really couldn't imagine this deal getting done at even close to this valuation with any other bankers in our space."

## H.    FT Partners Helps Find an Acquirer for SeedInvest

153.    Several months after entering into the Circle Agreement and prior to entering into negotiations with Concord, Circle, given its precarious cash position, asked FT Partners to help find a potential buyer for SeedInvest to provide Circle with the cash necessary to continue operating.

154.    FT Partners worked diligently to help find a buyer, including by using its extensive contacts to identify prospective buyers.

155.    FT Partners helped secure interest from multiple prospective buyers.  One buyer, with whom FT Partners had an introduction call and later negotiated, ended up making a highly attractive offer for SeedInvest.

156.    However, on March 23, 2021, a little over two weeks after Circle signed the term sheet with Concord, Circle's Board of Directors decided to reject that offer and retain the SeedInvest business.  On information and belief, the reason for this was that, because of FT Partners' efforts in securing the Convertible Note Financing and a term sheet from Concord, Circle's financial position had significantly improved and so it no longer needed the cash from a sale of SeedInvest to continue operating.

## I.    Circle Begins a Campaign of Harassment to Avoid Its Obligation to Pay FT Partners a Company Sale Fee

157.    Circle's executives consistently praised FT Partners' extensive work on the Acquisition, including noting that FT Partners was responsible for securing an Acquisition price that was billions of dollars higher than what Concord originally offered.  But once FT Partners had

completed the vast majority of the financial advisory services that Circle required in connection with the Convertible Note Financing and Acquisition, Circle began to change its tune.

158.    In early 2021, unwilling to live up to its end of the bargain, Circle began manufacturing reasons why FT Partners was not entitled to a Transaction Fee in connection with Circle's contemplated Company Sale to Concord and began engaging in improper harassment and other tactics designed to pressure FT Partners into dramatically reducing its fee.  This about-face appears to have stemmed from Circle realizing that—due to the significant valuation for Circle that FT Partners had negotiated—the Transaction Fee would be quite sizable.  Notably though, the size of the fee to which FT Partners would be entitled could not have come as a surprise to Circle. As described above, the Circle Agreement made plain that should Circle achieve a multi-billion dollar valuation in a Company Sale, FT Partners would be entitled to roughly 9%-10% of that amount.  Circle also knew from day one that even if the Acquisition was an alternative transaction rather than a Company Sale (though it was a Company Sale), FT Partners would be entitled to a fee on that transaction and the Circle Agreement would stay in place, such that FT Partners would also be entitled to a 9%-10% fee on any future Company Sale that valued Circle materially above $1 billion.

159.    In the days prior to signing the term sheet or definitive agreements with Concord, Circle initially tried to conceal the existence of any potential fee dispute from Mr. McLaughlin so that Mr. McLaughlin would proceed with the successful work he and FT Partners had been performing, and presumably believing that doing so would give Circle a stronger position once it fully revealed its intent to breach the Circle Agreement.  On February 12, 2021, Patrick Corker, a Circle employee, called Mr. Little to ask about FT Partners' fee for the Company Sale and also requested that Mr. Little not raise the topic with Mr. McLaughlin.  Circle's own actions thus

confirm that Circle understood and believed the Acquisition would be a Company Sale, as otherwise there would be no reason for Circle to proactively express concern over the size of FT Partners' fee. Given the nature of Circle's request, the importance of the issue, and Mr. Little's duty to his employer, Mr. Little discussed this topic with Mr. McLaughlin immediately, prompting Mr. McLaughlin to immediately call Mr. Allaire and ask whether Circle took issue with the fees owed to FT Partners. In response, Mr. Allaire praised FT Partners' work, and, to induce FT Partners to continue that work, assured Mr. McLaughlin that he would handle any issues regarding the fee and that Mr. McLaughlin should not worry about FT Partners being paid the Company Sale fee. Notably, FT Partners at no time sent an invoice for a Company Sale fee to Circle, but was merely responding to Circle's own positioning that the acquisition by Concord was a Company Sale.

160.    On March 4, 2021, two days before Circle signed the term sheet with Concord and prior to any discussion of claims or litigation, Mr. Allaire offered in an email to pay FT Partners a fee of $200 million in cash—far less than the roughly $400 million Company Sale fee that FT Partners would have been owed (before any fees on future earnouts) upon closing of the initial $4.5 billion acquisition by Concord. However, this $200 million offer was many times more than what Circle later claimed was the maximum that FT Partners could possibly receive under the Circle Agreement in connection with the Acquisition. If Circle truly believed its later manufactured legal arguments that FT Partners was not entitled to a full Company Sale Fee, it would not have made this offer or otherwise attempted to deprive FT Partners of the compensation it was owed for its successful work. Mr. Allaire's offer of roughly 50% of the amount even Circle computed it would owe FT Partners therefore confirms that Circle understood that the Acquisition

would be a Company Sale. Because FT Partners had come to the same logical conclusion, it rejected this unreasonably low offer.

161.    Circle then escalated its attempt to avoid its obligation to pay FT Partners the agreed-upon fee. Beginning with a March 10, 2021 letter, a full month after Mr. Corker tried to hide from Mr. McLaughlin Circle's concerns over the size of FT Partners' fees on the Acquisition, Circle shockingly began to advance a new and manufactured variety of nuanced legal arguments that the Acquisition was somehow not a Company Sale, none of which can overcome the Circle Agreement's language. Notably, Circle began making this claim only after FT Partners had successfully and completely negotiated the $4.5 billion valuation and Circle realized that this excellent result would be accompanied by a substantial Company Sale fee. Prior to this, Circle had always acted in a way consistent with its understanding that the Acquisition would be a Company Sale.

162.    Under the Circle Agreement, there are three alternative ways that a transaction can be a Company Sale: "the sale of all or at least 50%" of Circle stock, the "merger or combination of the Company with an acquirer," or "acquisition of all or at least 50%" of Circle's "assets," "income," or "business." (Ex. A, at Annex B.) The Acquisition needed only to have met one of these tests to be a Company Sale, but squarely met all three: (i) Circle shareholders were to sell all of their stock in exchange for TopCo stock; (ii) Circle was to merge or combine with Concord and TopCo; and (iii) Concord (in substance) and TopCo (in form) were to acquire the entirety of Circle's "assets," "income," and "business." Circle's arguments to the contrary are not persuasive.

163.    *First*, Circle asserted that Concord was not acquiring Circle because the acquisition was conducted through a holding company. But the Circle Agreement specifically contemplates such a scenario, and not one of the three tests above turn on whether the acquirer is a holding

company.  Indeed, the Circle Agreement broadly defines Company Sale to include, "whether effected in one transaction or *a series of transactions*, any merger, consolidation, restructuring, reorganization, recapitalization, joint venture, exchange or other transaction or analogous event." (*Id.* (emphasis added).)  The substance of the Acquisition was that Concord was going to acquire Circle—whether in a single transaction or a series of related transactions—which is further confirmed by the media coverage and public understanding of the Acquisition.  That Concord had chosen to do so through a newly created holding company for tax reasons does not change this.[9]

164.    *Second*, Circle argued that TopCo, which would have acquired 100% of Circle's shares, was somehow not an acquirer because Circle's shareholders would have owned a majority of TopCo's shares after the Acquisition.  But the definition of a Company Sale does not turn on who owns the acquirer, but rather who owns Circle:  a Company Sale occurs whenever there is

---

[9]    Circle's transactional counsel, Goodwin Proctor LLP, was well aware of this.  In January 2020, Open Lending, LLC announced that a SPAC would "acquire Open Lending through a new Delaware holding company."  *Open Lending and Nebula Acquisition Corporation Announce Business Combination Agreement*, PR Newswire (Jan. 6, 2020), https://www.prnewswire.com/news-releases/open-lending-and-nebula-acquisition-corporation-announce-business-combination-agreement-300981386.html.  FT Partners served as Open Lending's strategic and financial advisor, and Goodwin Proctor was Open Lending's transactional counsel.  After that transaction closed in June 2020, FT Partners was paid a Company Sale Transaction Fee pursuant to its engagement letter with Open Lending, which had a similar definition of Company Sale as is at issue here.  Concord's transactional counsel, Greenberg Traurig LLP, was likely also well aware of this: it served as transactional counsel to Nebula—the SPAC that acquired Open Lending.

Likewise, in March 2022, Forge Global, Inc.—advised by both FT Partners and Goodwin Proctor—was acquired by a SPAC.  *Forge Global, Inc. and Motive Capital Corp Announce Closing of Business Combination to Create the First Publicly Traded Private Securities Marketplace*, Business Wire (Mar. 22, 2022), https://www.businesswire.com/news/home/20220322005330/en/Forge-Global-Inc.-and-Motive-Capital-Corp-Announce-Closing-of-Business-Combination-to-Create-the-First-Publicly-Traded-Private-Securities-Marketplace.  Here too, FT Partners was paid a Company Sale Transaction Fee pursuant to its engagement letter with Forge Global, which had a similar definition of Company Sale as is at issue here.

"the sale of all or at least 50% of the issued and outstanding equity securities of the Company [*i.e.*, Circle] to an acquirer where the holders of capital stock of the Company prior to the Company Sale cease to hold a majority of the capital stock following such Company Sale." (*Id.*) If the Acquisition had been consummated, Circle's shareholders would have gone from owning 100% of Circle's shares to owning 0% of Circle's shares, as TopCo would have become Circle's sole shareholder. Circle's shareholders, in turn, would hold billions of dollars' worth of TopCo. That squarely establishes that the contemplated Acquisition constituted a Company Sale. Indeed, TopCo's original name was Circle *Acquisition* Public Limited Company.

165.    *Third*, Circle argued that, even if the Acquisition was a Company Sale, the Aggregate Consideration to be paid to Circle's shareholders would be $0 (the supposed fair market value of TopCo's shares the day before the Acquisition), which in turn would mean that FT Partners was only entitled to the Minimum Fee of $4 million. (*See* Ex. A, § 2(b)(i).) This position is, of course, preposterous, as Circle cannot possibly believe that its shareholders would have agreed to give up their valuable Circle shares for TopCo shares worth nothing.

166.    A change Circle made to its constitution in May 2022 confirms that Circle understood that the Acquisition would be a Company Sale and was not acting in good faith when it claimed otherwise. Before May 2022, Circle's constitution provided that if a "Liquidation Event" occurs, Circle could be required to make significant payments to the holders of its preferred stock. A "Liquidation Event" was defined to include any "Acquisition." In turn, "Acquisition" was defined to include: (i) "any scheme of arrangement, consolidation or merger of the Company," unless "the shareholders of the Company immediately prior to such consolidation, merger or reorganisation, continue to represent at least a majority of the voting power of the surviving entity"; and (ii) "any transaction or series of related transactions to which the Company is a party in which

in excess of fifty percent (50%) of the Company's voting power is transferred." Thus, the Acquisition of Circle would constitute an "Acquisition" under Circle's own constitution, and therefore potentially impose significant obligations on Circle.

167.    To avoid this, Circle amended its constitution in May 2022 to exclude specifically "the De-SPAC Transactions when consummated in accordance with the De-SPAC Agreements," *i.e.*, the Acquisition, from its constitution's definition of an "Acquisition"—thus confirming that Circle believed the Acquisition would otherwise be an "Acquisition" under Circle's constitution.

168.    Importantly, one of the definitions of an "Acquisition" under Circle's constitution is materially similar to one of the definitions of a "Company Sale" under the Circle Agreement. Thus, even as Circle was arguing to FT Partners that the Acquisition of Circle did not constitute a Company Sale, it was taking actions entirely dependent on its understanding that the Acquisition of Circle was an "Acquisition" under Circle's constitution. Given the material similarities between one of the definitions of "Acquisition" and one of the definitions of "Company Sale," Circle must have known that the Acquisition of Circle would be a Company Sale.

169.    Circle even alleged that paying FT Partners the Company Sale Fee would have somehow inhibited a successful transaction with Concord. After FT Partners rightly rejected that argument as baseless, Circle doubled down by procuring from Concord a contrived letter, dated April 16, 2021, that claimed that FT Partners being paid its agreed-upon Transaction Fee based on a Company Sale "will likely preclude [Circle's and Concord's] mutual ability to complete the proposed transactions, including to obtain commitments for the necessary PIPE, on the timetable proposed (if at all)." The referenced PIPE was Concord's planned sale of $415 million of its shares through a private investment in public equity ("PIPE Financing") in order to raise additional funds

in connection with the Acquisition. Circle then forwarded this letter to FT Partners on April 19, 2021, claiming that it validated Circle's concern.

170.    But Circle knew that any purported threat to the transaction was illusory because, as FT Partners would later suggest to Circle, Circle could remove that supposed obstacle simply by paying FT Partners what Circle agreed it owed under Circle's own (flawed) interpretation of the Circle Agreement, and then having Circle's shareholders agree to indemnify TopCo for any excess amount Circle ultimately agreed to pay, or was determined to owe, to FT Partners under FT Partners' interpretation of the Circle Agreement or otherwise.

171.    In fact, Circle again seemingly took FT Partners' advice and ultimately set up such an indemnity. As detailed in the Form S-4 filed in connection with the Acquisition, Circle arranged that, in connection with the closing of the Acquisition, TopCo and certain of its shareholders would enter into an agreement to deposit 35.5 million TopCo Ordinary Shares into escrow specifically for the purpose of covering Circle's liability to FT Partners ("Escrow Agreement"). Given this commitment, it is no surprise that the Acquisition and PIPE Financing were ultimately signed, belying Circle's manufactured concern.

172.    Circle also repeatedly threatened FT Partners on the basis that, by simply seeking its contractually owed fee, FT Partners was somehow interfering with the Acquisition and PIPE Financing. As the Escrow Agreement, signing of the Acquisition, and full commitment of the PIPE financing demonstrate, those threats were likewise part of an underhanded campaign to bully FT Partners into accepting a lower fee.

173.    Despite all of this, FT Partners, solely in the hopes of resolving the dispute rather than truly believing that the transaction was not a Company Sale, expressed that it was indeed willing to consider Circle's request to treat the Acquisition as an "alternative transaction" under

Section 2(d) of the Circle Agreement, *i.e.*, one that did not fit into the definition of either a Capital Raise or a Company Sale.  As contemplated in the Circle Agreement, such alternative transactions could include, for example, transactions in which the Company engaged in buying assets or buying another company, going through a bankruptcy process, or taking out a loan—but (contrary to Circle's flawed interpretation) they do *not* include transactions that resulted in the sale or merger of Circle.

174.    If it was agreed by all parties to the Circle Agreement that the Acquisition was going to be treated an "alternative transaction," then FT Partners would be entitled to a fee commensurate with "the custom and practice among investment banks in similar size and type of transactions."  (Ex. A, § 2(d).)  In that case, as the Circle Agreement makes clear, the agreement would remain in effect, thus entitling FT Partners to a full Transaction Fee on a Company Sale if and when a Company Sale occurred, as well as on any Capital Raises prior to that.  Accordingly, FT Partners requested Circle to expressly confirm that, if the parties decided to deem the Acquisition an alternative transaction, the Circle Agreement would remain in full force and effect.[10]

175.    Despite the clear language of the Circle Agreement, which states that "the term of this letter agreement will . . . end upon the earlier of consummation of a Company Sale or earlier termination of this letter agreement as provided below" (Ex. A, § 6), Circle refused to acknowledge that critical fact.  Instead, it shockingly took the unsupported position that an alternative transaction

---

[10]    FT Partners also expressed to Circle that it was willing to receive most of its compensation in Circle stock so as to minimize any burden on Circle's cash position (which had been greatly strengthened due to the prior financing that FT Partners secured for Circle).

would terminate the Circle Agreement, thus denying FT Partners its entitlement to a Company Sale fee if and when one occurred.

176.    Notably, this argument directly contradicted Circle's previous position.  In July 2020, Circle, with assistance from FT Partners, entered into the Debt Financing discussed above. Under the Circle Agreement, the Debt Financing was an alternative transaction because it did not constitute either a Company Sale or a Capital Raise, and Circle accordingly paid the alternative transaction fee it owed to FT Partners for the Debt Financing.  However, Circle correctly recognized that the Engagement Letter continued in effect notwithstanding that alternative transaction.  It was only in 2021 that Circle, now searching for and clearly willing to manufacture any possible excuse to avoid paying a large Transaction Fee that it had previously agreed to in order to incentivize FT Partners' performance, began to claim that an alternative transaction would somehow terminate the Circle Agreement.  Circle's newfound position made it impossible for FT Partners to agree to treat the Acquisition as an alternative transaction.

**J.    Circle Tries to Cut Ties with FT Partners to Manufacture Grounds to Terminate the Circle Agreement**

177.    Circle thus realized that, its incorrect legal argument aside, the only way to avoid paying FT Partners a Company Sale fee or gain leverage in the negotiation, either now or in the future, would be to attempt to terminate the Circle Agreement.  Furthermore, by early 2022 at the latest, unbeknownst to FT Partners, Circle was contemplating a Capital Raise (ultimately culminating in the $401 million May 2022 Capital Raise), for which FT Partners would also be clearly entitled to a significant Transaction Fee of over $28 million under Section 2(e) of the Circle Agreement.

178.    To escape its payment obligations to FT Partners, Circle needed to manufacture grounds to terminate (wrongfully) the Circle Agreement.  As part of Circle's plan to begin

manufacturing pretexts for ultimately purporting to terminate the Circle Agreement, in April 2021 Circle began cutting ties with FT Partners and denying FT Partners its contractually agreed status as Circle's "exclusive financial and strategic advisor" under the Circle Agreement.

179.    Circle plotted that if it simply cut off FT Partners and prevented FT Partners from assisting Circle any further, Circle could manufacture an argument that "Good Reason" existed to terminate the Circle Agreement under Section 6.  "Good Reason" is defined as:  (a) FT Partners "materially breach[ing]" the Circle Agreement; (b) FT Partners having a "conflict of interest materially detrimental to" Circle; or (c) if "neither Steven J. McLaughlin nor Randall Little are the lead or co-lead advisors for FT Partners representing FT Partners and actively involved in any prospective Transaction."

180.    On March 14, 2021, Mr. McLaughlin traveled from Miami to Palm Beach (where Mr. Allaire was vacationing) on a weekend to meet personally with Mr. Allaire to try to resolve the situation.  Although the situation was not resolved, Mr. McLaughlin offered to speak again at Mr. Allaire's convenience at any reasonable place and time in order to resolve the dispute. Mr. Allaire refused to meet again with Mr. McLaughlin.

181.    On April 8, 2021, Circle escalated the dispute further by demanding that Mr. McLaughlin cease all work relating to Circle and be walled off from FT Partners employees working with Circle.  Circle did not point to any action taken by FT Partners in the month since Circle signed the term sheet with Concord—at which time Circle had repeatedly praised FT Partners' stellar performance.  Instead, Circle claimed that the fee dispute had given Mr. McLaughlin a conflict of interest that prevented him from effectively working on the Acquisition.  This demand that Mr. McLaughlin stop working on Circle matters was a blatantly transparent attempt to manufacture a supposed breach by FT Partners by forcing FT Partners to

either: (i) refuse to comply with these invented new obligations; or (ii) comply and risk Circle claiming that it now had Good Reason to terminate the Circle Agreement under Section 6, which allows Circle to terminate the Circle Agreement if "for any reason neither Steven J. McLaughlin nor Randall Little are the lead or co-lead advisors for FT Partners representing FT Partners and actively involved in any prospective Transaction."   Circle's attempt to engineer a cause for termination undermines any claim that it acted in good faith.

182.    Circle then required FT Partners to limit its work for Circle to specified tasks.

183.    Despite the fee dispute—and Circle's attempt to deprive FT Partners of critical information and manufacture a supposed breach—FT Partners emphasized that it was always ready, willing, and able to actively advise Circle on any transactions, including the Acquisition and PIPE Financing, in good faith.   Moreover, as the Acquisition was never consummated, FT Partners never even sent an invoice for any fee for the Acquisition.

**K.    Circle, Concord, and Public Commentators All Recognized the Acquisition as a Company Sale**

184.    On July 7, 2021, Concord, Circle, TopCo, and TopCo (Ireland) Merger Sub, Inc. ("TopCo Merger Sub") officially entered into a so-called Business Combination Agreement under which Concord would "de-SPAC" by acquiring Circle.   Like TopCo, TopCo Merger Sub was formed specifically to effectuate the Acquisition and TopCo Merger Sub is a wholly owned subsidiary of TopCo.   The Business Combination Agreement had a termination date of April 3, 2022.

185.    Circle's other advisors conceded that the Acquisition was a Company Sale.   For example, in a July 9, 2021 press release advertising the deal, Circle's corporate counsel (Goodwin

Proctor LLP) touted that "a new Irish holding company [*i.e.*, TopCo] will *acquire* both Concord and Circle and become a publicly traded company."[11]  (Emphasis added.)

186.    Unsurprisingly, the Acquisition was publicized and broadly understood as an acquisition of Circle by Concord or a merger between Circle and Concord.  For example, the *Wall Street Journal* reported that, "[o]n Thursday, Circle said it is merging with Concord Acquisition Corp.," *Reuters* referred to a "Circle merger," *Digital Transaction* wrote "Circle Internet Financial Inc. announced early Thursday it has agreed to be acquired by Concord Acquisition Corp," and a *Law360* article stated, "Circle will go public at an enterprise value of $4.5 billion by merging with a special purpose acquisition vehicle."  Additional examples are listed in Appendix 1.

187.    Concord also acknowledged the obvious fact that it intended to merge with Circle. On an investor call on July 8, 2021, Concord's chairman Bob Diamond referred to Circle as a "merger partner."  Likewise, in the Form S-4—an SEC form that companies file in connection with *mergers and acquisitions*—Concord stated that "representatives of Concord submitted non-binding letters of intent to, or engaged in similar substantive discussions of potential terms with, *five potential acquisition targets (including Circle)* following evaluation of, and discussions with, each such potential acquisition target."  (Emphasis added.)  Likewise, in Concord's Form 10-K filings it has referred to "the types of businesses we intend to *acquire*" and seeking an "*acquisition target.*"  (Emphasis added.)

188.    Concord even told its investors in its November 16, 2021 Form 10-Q that it "will only complete a Business Combination if the post-Business Combination company *owns or*

---

[11]    https://www.goodwinlaw.com/news/2021/07/07_09-circle-to-go-public-through-business; *see also supra* at ¶ 125 & n.6 (article by now-Goodwin Proctor LLP partner noting that SPACs "acquire" a target "operating business" in "a transaction commonly known as a 'business combination' or 'de-SPAC transaction'").

*acquires 50% or more of the outstanding voting securities of the target* or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act." (Emphasis added.) Concord's representations makes clear that the Acquisition, if completed, would have constituted a Company Sale under two of the tests discussed above. *First*, a Company Sale occurs whenever "[a] Transaction result[s] in the transfer of at least 50% of the Company's voting stock." (Ex. A, at Annex B.) *Second*, a Company Sale occurs whenever there is "the sale of all or at least 50% of the issued and outstanding equity securities of the Company to an acquirer." (*Id.*)

189.    The SEC has likewise acknowledged that SPACs like Concord are "managed by a sponsor for the purpose of merging with or acquiring" another company through a de-SPAC transaction that is "structured as an M&A transaction." *Special Purpose Acquisition Companies, Shell Companies, and Projections*, Securities and Exchange Commission (Jan. 24, 2024), at 8, https://www.sec.gov/files/rules/final/2024/33-11265.pdf; *see also id.* at 25 (defining "de-SPAC transaction" as "a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, involving a special purpose acquisition company and one or more target companies").

**L.    Circle's Exclusion of FT Partners from Its Press Releases on the Convertible Note Financing and Acquisition**

190.    In furtherance of its ongoing efforts to improperly cut ties with FT Partners and manufacture grounds to terminate the Circle Agreement, Circle also omitted FT Partners from press releases and public announcements in breach of the Circle Agreement both before and after the Acquisition was first announced in July 2021.

191.    As noted above, the Circle Agreement requires that Circle reference FT Partners' role as its exclusive financial and strategic advisor in any press releases announcing a Transaction.

This provision ensures that FT Partners receives the public relations, marketing, and reputational benefits that stem from recognition of its role as exclusive financial and strategic advisor for Circle on a significant transaction.

192.    On May 28, 2021, Circle issued a press release regarding the Convertible Note Financing[12] that did not contain any reference to FT Partners or FT Partners' role as exclusive financial and strategic advisor to Circle and Circle's Board.

193.    This financing constituted a Capital Raise, and thus a Transaction under Annex B of the Circle Agreement.  (Ex. A, at Annex B ("a '**Capital Raise**' means a transaction in which the Company or the Company's stockholders sell to an investor . . . equity-linked interests (including, without limitation, *convertible debt*, debt with warrants or hybrid capital) . . . representing less than 50% of the Company's capital stock or equivalents or those of any of its subsidiaries") (emphasis added); *id.* ("a '**Transaction**' means the consummation of either of a Company Sale or a Capital Raise").)  Circle conceded as much by paying FT Partners the appropriate Transaction Fee for this Capital Raise.  Accordingly, Circle's failure to reference FT Partners' role as Circle's exclusive financial and strategic advisor constituted a breach of the Circle Agreement.

194.    Underscoring the severity of that breach, Circle heralded this financing as "among the top 10 in private fintech investments," "includ[ing] investments from leading private equity,

---

[12]    *See Circle Completes $440 Million Financing to Drive Growth and Market Expansion*, PR Newswire (May 28, 2021), https://www.prnewswire.com/news-releases/circle-completes-440-million-financing-to-drive-growth-and-market-expansion-301301850.html; https://www.circle.com/blog/circle-completes-440-million-financing-to-drive-growth-and-market-expansion.

institutional and strategic investors."[13]    The media likewise dubbed it "the largest crypto [financing] round in history."[14]

195.    Additionally, on July 8, 2021, Circle issued a press release entitled "Circle to go public through a business combination with Concord Acquisition Corp, supported by over $1.1B in capital."[15]  Circle's failure to reference FT Partners or FT Partners' role as exclusive financial and strategic advisor to Circle violated Section 9 of the Circle Agreement.  That the press release named *Concord's* exclusive financial advisor and several other Circle and Concord advisors demonstrates the deliberate and vindictive nature of Circle's breach.

196.    In fact, Circle's intentional refusal to identify FT Partners as its advisor in its press release led *Reuters* to report that Cowen Inc. was Circle's lead capital markets advisor,[16] thereby bestowing the fruits of FT Partners' labor on a rival investment bank.

197.    On July 21, 2021, FT Partners requested that Circle issue a press release correcting these breaches.  Circle replied that it was considering this request, but as of the date of filing of this complaint, Circle has not issued any correction.

---

[13]    *See supra* at n.12.

[14]    *12 Largest Venture Rounds In Crypto History*, Forbes (May 28, 2021), https://www.forbes.com/sites/ninabambysheva/2021/05/28/440-million-circe-investment-is-the-largest-crypto-round-in-history/?sh=5fc2e727379f.

[15]    *Circle to Go Public Through a Business Combination with Concord Acquisition Corp, Supported by Over $1.1B in Capital,* Circle (July 8, 2021), https://www.circle.com/hubfs/investors/Press-Release-Circle-Concord-July2021.pdf

[16]    *Goodwin, Greenberg Traurig Drive Circle's Union with Bob Diamond's SPAC*, Reuters (July 8, 2021), https://www.reuters.com/legal/transactional/goodwin-greenberg-traurig-drive-circles-union-with-bob-diamonds-spac-2021-07-08/.

### 1.    Circle's Unreasonable Rejection of FT Partners' Proposed Announcements

198.    Section 9 of the Circle Agreement also provides that:

> FT Partners may, at its option and expense, place an announcement in such newspapers, electronic media and periodicals as it may choose, stating that FT Partners has acted as the exclusive financial and strategic advisor to the Company in connection with any Transaction or alternative transaction in which it is involved; provided that (a) the Transaction has closed or been announced by the Company and (b) the Company shall have the right to approve such announcement in advance, such approval not to be unreasonably withheld or delayed.

199.    FT Partners provided advance copies of customary announcements of both the Convertible Note Financing and the Acquisition on July 21, 2021.  These proposed announcements did not contain any confidential information or give Circle any reasonable basis to object to them.

200.    Circle nonetheless refused to approve FT Partners' proposed transaction announcement regarding FT Partners' role as exclusive financial advisor to Circle in the Convertible Note Financing, demanding that FT Partners remove any statements purportedly made by Mr. Allaire or any other Circle representative.   But FT Partners' proposed transaction announcement included only one quotation from a Circle representative:  Mr. Allaire's statement describing Circle, which was included in Circle's own press release touting the financing.  Circle's press release was distributed to the news media and the quotation that Circle demanded FT Partners remove was and still is publicly available.  Circle's refusal to approve FT Partners' proposed announcement was not reasonable.

201.    Moreover, Circle wholly withheld its approval of FT Partners' proposed announcement of the Acquisition, claiming that the announcement was supposedly misleading because it: (i) identified the transaction as a single merger; (ii) described FT Partners as the exclusive financial advisor to Circle without stating (falsely) that FT Partners' role was limited to identifying Concord and certain "preliminary discussions about broad deal terms and structure";

and (iii) suggested that FT Partners continues to provide meaningful advisory services to Circle. None of these objections is accurate: (i) the Acquisition plainly was going to be an integrated transaction that constituted a merger, even if there were multiple components; (ii) FT Partners did serve as Circle's exclusive financial advisor, and as detailed above it was deeply involved in negotiating the Acquisition; and (iii) FT Partners continued to provide meaningful advisory services despite Circle's improper efforts to limit FT Partners' role and access to information. Accordingly, it was unreasonable for Circle to withhold its approval on these purported bases.

202.    Accordingly, Circle's refusal to allow FT Partners to publish an accurate and customary announcement violates Section 9 of the Circle Agreement.

203.    These breaches have damaged FT Partners by denying it the publicity that would result from the announcement of FT Partners' exclusive advisory role in the Convertible Note Financing—which was the then-largest crypto investment round and one of the largest private fintech investments—and the then-anticipated Acquisition of Circle by Concord.  While the Acquisition ultimately fell through due to Circle and Concord's inability to secure SEC approval, FT Partners was nonetheless deprived of the positive publicity it would have received in connection with its role in securing the Acquisition in the first place, especially given that the termination of the Acquisition was unrelated to FT Partners' advisory role in the transaction.  As a result, FT Partners suffered reputational injury and was unable to realize the benefits of the parties' bargain.

### 2.    Circle's Failure to Provide Material Draft Documents to FT Partners

204.    Section 7(a) of the Circle Agreement requires Circle to "furnish FT Partners with all information and data that FT Partners shall reasonably deem appropriate in connection with FT Partners' activities on the Company's behalf," and, "upon request, any documentation FT Partners may reasonably request in order to calculate the Transaction Fee due hereunder."

205.    Under these provisions and customary deal practice, FT Partners was entitled to receive all drafts of the Form S-4, the Business Combination Agreement, and related documents, which it repeatedly requested as they were prepared.

206.    Likewise, Section 7(c) states that, "[i]n the event the Company is required by law to make any filings with any governmental authority or any disclosure to any third party, including without limitation the security holders of the Company, which mentions FT Partners or the advice rendered by FT Partners hereunder, such disclosure shall be in a form and substance satisfactory to FT Partners and its counsel, in their sole discretion."

207.    Circle was required to, and did, participate in the filing of a Form S-4 with the SEC.

208.    Accordingly, FT Partners was also entitled to review any portions of the Form S-4 and other disclosures to investors that mention FT Partners or the advice it rendered.

209.    On August 4, 2021, Circle provided FT Partners with out-of-context excerpts of the portions of the Form S-4 that mentioned FT Partners just two days before it filed the Form S-4 with the SEC.  Circle did not respond to FT Partners' August 5, 2021 request that Circle provide FT Partners with the full draft at least 72 hours in advance of the intended filing time.  Indeed, FT Partners' request also noted that FT Partners' preliminary review of those excerpts found numerous material inaccuracies and omissions that appeared to be designed to mask from Concord stockholders the true nature of the Acquisition and the size of the Transaction Fee that FT Partners would be owed based on a Company Sale.

210.    Moreover, Circle refused to provide FT Partners with the draft Business Combination Agreement and other documents before they were publicly filed.

211.    Circle's refusal to provide FT Partners (i) the full draft Form S-4; (ii) adequate time to review the draft Form S-4; and (iii) the draft Business Combination Agreement and other documents before they were publicly filed violated Section 7(a) and (c) of the Circle Agreement.

212.    These breaches have caused damage to FT Partners' reputation and deprived FT Partners of the value of the publicity it would have received had its role been accurately disclosed in the Form S-4.

### 3.    The Form S-4 Filing

213.    On August 6, 2021, Circle participated in filing a Form S-4 that contained numerous misstatements and omissions regarding FT Partners and the advice FT Partners provided, despite FT Partners alerting Circle that it did not approve of those disclosures.  This further violated Section 7(c) of the Circle Agreement, which requires that in such filings, any disclosures that "mention[] FT Partners or the advice rendered by FT Partners [under the Circle Agreement] . . . shall be in a form and substance satisfactory to FT Partners and its counsel, in their sole discretion."

214.    The Form S-4 omitted numerous material facts regarding the fee dispute between Circle and FT Partners, including: (i) the specifics of the fee formula; (ii) the definition of Company Sale, and the fact that the central dispute was whether the Acquisition constituted a Company Sale; (iii) that the Transaction Fee is determined, in part, based on the trailing average price of Concord stock prior to closing; (iv) that the Transaction Fee would be payable at closing and would accrue interest at a 2% monthly rate (or the highest amount permitted by law) unless contested in good faith; (v) that FT Partners would be entitled to receive additional fees based on any earnout payments; and (vi) that the Transaction Fee payable to FT Partners if the earnout payment triggers were achieved, excluding any interest accrued due to Circle's failure to pay the fee when due, would be hundreds of millions to billions of dollars.

215.    Finally, the Form S-4 failed to: (i) clearly state that even if Circle was right (which it is not) and the Acquisition was not a Company Sale, then Circle (to its own admission) would have still owed FT Partners a substantial alternative fee, *and* the Circle Agreement would remain in full effect thereafter until a future Company Sale did occur; (ii) explain that FT Partners will be entitled to Transaction Fees in connection with that future Company Sale (which could be far more significant than a Company Sale fee for the Acquisition) and any further Capital Raises that occur before that Company Sale; and (iii) specify the fee percentages and formulas applicable to such future transactions.

216.    On October 4, 2021, Circle participated in filing an Amended Form S-4 that failed to correct these misstatements and omissions.

217.    On December 23, 2021, Circle participated in filing a Second Amended Form S-4 that again failed to correct these misstatements and omissions.

218.    On May 6, 2022, Circle participated in filing a Third Amended Form S-4 that again failed to correct these misstatements and omissions.

219.    On July 11, 2022, Circle participated in filing a Fourth Amended Form S-4 that again failed to correct these misstatements and omissions.

220.    On August 30, 2022, Circle participated in filing a Fifth Amended Form S-4 that again failed to correct these misstatements and omissions.

221.    On October 20, 2022, Circle participated in filing a Sixth Amended Form S-4 that again failed to correct these misstatements and omissions.

222.    On November 14, 2022, Circle participated in filing a Seventh Amended Form S-4 that again failed to correct these misstatements and omissions.

223.    The filing of each of these Form S-4s violated Section 7(c) of the Circle Agreement.

224.    These misstatements and omissions have caused damage to FT Partners' reputation and deprived FT Partners of the value of the publicity it would have received had its role been accurately disclosed in the Form S-4. Moreover, for each of these amended Form S-4s, Circle failed not only to provide FT Partners with a complete copy of the Form S-4 and relevant business documents before the Form S-4 was filed, but Circle did not even provide FT Partners with the portions of the Form S-4 concerning FT Partners.

## M.    Concord and Circle Renegotiate the Acquisition

225.    In January 2022, it became clear that Circle and Concord would not be ready to close the transaction by the April 3, 2022 termination date contemplated in the Business Combination Agreement.

226.    As a result, Circle and Concord "tweak[ed]" their "merger agreement" to accommodate the delay.[17] They terminated the Business Combination Agreement on February 16, 2022 and simultaneously entered into a new Transaction Agreement, whose terms generally matched those of the Business Combination Agreement with two primary exceptions.

227.    *First*, the Transaction Agreement valued Circle at $9 billion instead of $4.5 billion, reflecting the growth of the cryptocurrency market and Circle's prospects in the intervening seven months. *Second*, the Transaction Agreement had a termination date of December 8, 2022, with the possibility to extend that date to January 31, 2023.

228.    While Circle could have chosen a new acquirer instead of renegotiating with Concord, it stuck with Concord—which FT Partners had introduced Circle to in the first place.

---

[17]    *DeSPACs Get Juiced, Circle Gets a 2x Valuation, JAAC Ditches SPAC IPO Plans*, The Street (Feb. 17, 2022), https://www.thestreet.com/boardroomalpha/spac/spacs-ispo-jaac-cnd-qngy.

This further confirms the value to Circle's shareholders of FT Partners' work in identifying potential transaction partners.

229.    Circle also doubled down on its breaches:  its February 17, 2022 press release announcing the Transaction Agreement and its new $9 billion valuation again omitted any mention of FT Partners or FT Partners' role as exclusive financial and strategic advisor to Circle.[18]  Circle again named Concord's exclusive financial advisor, along with several other Circle and Concord advisors—leaving no doubt that its omission of FT Partners was deliberate. Circle's breaches of the Circle Agreement have damaged FT Partners by preventing FT Partners from realizing the benefits of the parties' bargain.  Circle also failed to provide FT Partners the draft Transaction Agreement and other documents before they were publicly filed.

## N.    Circle Purports to Terminate the Circle Agreement

230.    On March 25, 2022, Circle's Board of Directors, acting without any good faith, passed a resolution resolving to terminate the Circle Agreement.  Circle did not disclose this attempt to terminate the Circle Agreement until April 8, 2022, when Circle sent FT Partners the generic one-paragraph Circle Notice (replicated in full below) purporting to terminate the Circle Agreement, but shockingly providing absolutely no specifications, timeline, or justifications other than simply cutting and pasting certain portions of the language of Section 6 of the Circle Agreement:

---

[18]    *Circle Valued at $9B in New Transaction Terms Agreed with Concord Acquisition Corp,* PR Newswire (Feb. 17, 2022), https://www.prnewswire.com/news-releases/circle-valued-at-9b-in-new-transaction-terms-agreed-with-concord-acquisition-corp-301484791.html.

April 8, 2022

C̲o̲n̲f̲i̲d̲e̲n̲t̲i̲a̲l̲
V̲i̲a̲ E̲m̲a̲i̲l̲
Steve.McLaughlin@FTPartners.com

Financial Technology Partners LP | FTP Securities LLC
1 Front Street 31st Floor
San Francisco CA 94111

Re:    **NOTICE OF TERMINATION**

Dear Steve,

    I am writing in my capacity as Circle's Chairman and CEO to provide written notice that the July 1, 2020 engagement letter between Circle and FT Partners (the "Engagement Letter") is hereby immediately terminated for Good Reason under Section 6 of the Engagement Letter. Specifically, the Board of Directors of Circle has determined in good faith that FT Partners has materially breached its obligations under the Engagement Letter causing or likely to cause material harm to Circle; that FT Partners has and has had conflicts of interest materially detrimental to Circle that have not been waived by Circle; and that neither Steven J. McLaughlin nor Randall Little are the lead or co-lead advisors for FT Partners representing FT Partners and actively involved in any prospective Transaction. The Board has further determined that these matters have not been and cannot be cured.

Sincerely,

Jeremy D. Allaire

cc:    Michael B. Carlinsky, Quinn Emanuel Urquhart & Sullivan, LLP



Circle Internet Financial LLC    circle.com

231.    The supposed determination of Circle's Board of Directors to terminate the Circle

Agreement provides no explanation whatsoever for its basis and was obviously not made in good

faith.  Indeed, FT Partners has noted this for Circle, but Circle has refused to provide any information for the basis of any of the Good Reasons it claims permitted it to terminate the Circle Agreement or any supporting evidence of any Good Reason.  However, as the only issue between the parties at the time of the Circle Notice was simply whether FT Partners would be entitled to a Company Sale fee (or an alternative transaction fee resulting in the continuation of the Circle Agreement) upon the potential future closing of the Acquisition, FT Partners assumes that this was the motivating reason behind the termination and will explain why that dispute would not permit Circle to terminate the Circle Agreement.  Notably, each of Circle's Board members had a significant personal economic incentive not to pay FT Partners its contractually owed fees, further suggesting that this was the motivation for the purported termination.

232.    As noted above, Circle could only terminate the Circle Agreement if all of the following occurred: (i) one or more of the three specified Good Reasons has, in fact, occurred; (ii) Circle's Board then makes a good-faith determination that a Good Reason has occurred; (iii) Circle timely gives FT Partners written notice that Circle's Board has determined in good faith that "such Good Reason" exists, and that notice provides FT Partners with sufficient information concerning the specified Good Reason to allow FT Partners to determine whether it can cure the Good Reason and how to cure the Good Reason; (iv) if curable, FT Partners does not cure the Good Reason within 30 days of notice; and (v) if curable, Circle's Board then determines in good faith that FT Partners has failed to cure such Good Reason within 30 days.  If any of these preconditions are not met, a termination "shall" not "be effective."  (Ex. A, § 6.)

233.    Exactly none of these multitude of conditions was met as to any of the purported Good Reasons, when in fact each and every one of the conditions would have needed to have been met to effectuate a termination.

234.    Circle's first purported Good Reason was that FT Partners materially breached its obligations under the Engagement Letter causing or likely to cause material harm to [Circle]." This argument fails.

235.    *First*, FT Partners never "materially breached its obligations under the Engagement Letter," much less in a way "causing or likely to cause material harm to [Circle]."  In fact, FT Partners has always acted in the best interest of Circle, including obtaining financing for Circle that kept Circle's business alive, and negotiating the acquisition of Circle by Concord at a valuation of approximately $4.5 billion.  The only time Circle had previously even attempted to claim that FT Partners had breached the Circle Agreement or harmed Circle was when Circle falsely alleged that the fee dispute between Circle and FT Partners would somehow potentially prevent Concord's acquisition of Circle.  But no one could believe in good faith that FT Partners' expression of its legal right to a certain fee under the Circle Agreement both (i) constitutes a material breach of its obligations under the Circle Agreement; and (ii) somehow caused or was likely to cause material harm to Circle.  Indeed, that position is incompatible with the fact that the Circle Agreement contains dispute resolution provisions that do not include terminating the engagement.  (*See id.* § 8.)  Moreover, Circle and Concord subsequently *raised* the valuation of the Circle to approximately $9 billion.  Accordingly, FT Partners did not materially breach its obligations under the Circle Agreement, much less cause any material harm to Circle.

236.    *Second*, given this, Circle's Board could not, in good faith, have definitively determined otherwise.  The timing of the purported termination confirms this.  Circle's board rushed to terminate immediately before the May 2022 Capital Raise, because, absent a valid termination, once that Capital Raise closed, Circle would have indisputably owed FT Partners over

$28 million (a number that has since grown due to the interest payments required by Circle's failure to timely pay this fee).

237.    *Third*, the Circle Notice failed to provide any detail about: (i) how or even when FT Partners supposedly materially breached its obligations under the Circle Agreement; (ii) what material harm Circle suffered or was likely to suffer; and (iii) how the supposed material breach caused or was likely to cause that material harm.  As a result, Circle failed to comply with its obligation to provide FT Partners with sufficient information about the purported Good Reason to permit FT Partners to determine whether the purported Good Reason could be cured, and if so, how.

238.    *Fourth*, if the purported Good Reason was curable, and had Circle provided FT Partners the required 30 days to cure, FT Partners would have done so.  Importantly, the Circle Agreement does not permit Circle's Board to unilaterally determine whether a Good Reason is curable.  In the alternative, if the purported Good Reason was curable when it initially occurred, but was no longer curable as of the date of the Circle Notice, then Circle impermissibly delayed giving notice of the purported Good Reason, thus improperly nullifying FT Partners' required opportunity to attempt to cure.

239.    *Fifth*, because Circle did not provide FT Partners the required 30 days to cure, Circle's Board never made a good faith determination that FT Partners had failed to cure.

240.    Circle's second purported Good Reason was that "FT Partners has and has had conflicts of interest materially detrimental to Circle that have not been waived by Circle."  This argument likewise fails.

241.    *First*, FT Partners has never had "conflicts of interest materially detrimental to Circle that have not been waived by Circle."  In fact, Circle and FT Partners had exactly the same

interests here, namely for Concord to acquire Circle on the most optimal set of terms. Circle's apparent contention that, any time a financial advisor and a client have a dispute about the calculation of the financial advisor's fee amount under the terms of an engagement letter, such dispute constitutes a conflict of interest would render the term conflict of interest completely meaningless. This is doubly so given that the Circle Agreement expressly contemplates that: (i) there might be disagreements about the appropriate fee (*see id.* § 2(d) (requiring the parties to "negotiate in good faith the appropriate compensation for FT Partners" if Circle "completes an alternative transaction")); and (ii) the parties might need to go to court to resolve those disagreements (*see id.* § 8). Accordingly, this Good Reason did not exist.

242. *Second*, given this, Circle's Board could not, in good faith, have definitively determined otherwise. The timing of the purported termination confirms this. Circle's board rushed to terminate immediately before the May 2022 Capital Raise, because, absent a valid termination, once that Capital Raise closed, Circle would have indisputably owed FT Partners over $28 million (a number that has since grown due to the interest payments required by Circle's failure to timely pay this fee).

243. *Third*, the Circle Notice failed to provide any detail about: (i) what the purported conflicts of interest were; and (ii) how those purported conflicts were materially detrimental to Circle. As a result, Circle failed to comply with its obligation to provide FT Partners with sufficient information about the purported Good Reason to permit FT Partners to determine whether the purported Good Reason could be cured, and if so, how.

244. *Fourth*, the purported Good Reason was curable, and had Circle provided FT Partners the required 30 days to cure, FT Partners would have done so. Importantly, the Circle Agreement does not permit Circle's Board to unilaterally determine whether a Good Reason is

curable.  In the alternative, if the purported Good Reason was curable when it initially occurred, but was no longer curable as of the date of the Circle Notice, then Circle impermissibly delayed giving notice of the purported Good Reason, thus improperly nullifying FT Partners' required opportunity to attempt to cure.

245.    *Fifth*, because Circle did not provide FT Partners the required 30 days to cure, Circle's Board never made a good faith determination that FT Partners had failed to cure.

246.    Circle's third purported Good Reason was that "neither Steven J. McLaughlin nor Randall Little [was] the lead or co-lead advisors for FT Partners representing FT Partners and actively involved in any prospective Transaction."  This argument likewise fails.

247.    *First*, as to Mr. McLaughlin, this supposed basis for termination is a fiction completely of Circle's own attempted making, and as to Mr. Little, this supposed basis is blatantly false.  The Circle Agreement specifies that Circle is retaining FT Partners as Circle's "exclusive financial and strategic advisor in connection with possible Transactions."  Messrs. McLaughlin and Little were very actively involved in every aspect of Circle's transactions until Circle wrongfully attempted to manufacture a pretext for terminating the Circle Agreement by instructing that Mr. McLaughlin no longer be involved in working for Circle.  Even after that, Mr. Little continued to be the lead or co-lead advisor for FT Partners in its work for Circle until his departure from FT Partners in May 2023 (long after the failed attempt by Circle to terminate the Circle Agreement).  And as FT Partners has repeatedly made clear to Circle, Mr. McLaughlin has been, and remains, "ready, willing, and able" to assist Circle in any transaction, and the same was true of Mr. Little until his departure.  Indeed, it was Circle's repeated breaches of the Circle Agreement, including by failing to provide FT Partners with the requisite information concerning Circle's transactions, that impeded FT Partners' ability to provide the services to Circle called for in the

Circle Agreement. Circle's conduct—including unnecessarily barring Mr. McLaughlin from FT Partners' work for Circle, only to claim that it could terminate the Circle Agreement because Mr. McLaughlin was, against his own wishes, no longer involved—refutes any argument that Circle acted in good faith in terminating the Circle Agreement. Accordingly, this Good Reason did not exist.

248.    *Second*, given this, Circle's Board could not, in good faith, have definitively determined otherwise. The timing of the purported termination confirms this. Circle's board rushed to terminate immediately before the May 2022 Capital Raise, because, absent a valid termination, once that Capital Raise closed, Circle would have indisputably owed FT Partners over $28 million (a number that has since grown due to the interest payments required by Circle's failure to timely pay this fee).

249.    *Third*, the Circle Notice failed to provide any detail about how Mr. Little, who at all relevant times was ready, willing, and able to assist Circle, was not the lead or co-lead advisor for FT Partners on Circle matters. As a result, Circle failed to comply with its obligation to provide FT Partners with sufficient information about the purported Good Reason to permit FT Partners to determine whether the purported Good Reason could be cured, and if so, how.

250.    *Fourth*, the purported Good Reason was curable, and had Circle provided FT Partners the required 30 days to cure, FT Partners would have done so. Importantly, the Circle Agreement does not permit Circle's Board to unilaterally determine whether a Good Reason is curable. In the alternative, if the purported Good Reason was curable when it initially occurred, but was no longer curable as of the date of the Circle Notice, then Circle impermissibly delayed giving notice of the purported Good Reason, thus improperly nullifying FT Partners' required opportunity to attempt to cure.

251.    *Fifth*, because Circle did not provide FT Partners the required 30 days to cure, Circle's Board never made a good faith determination that FT Partners had failed to cure.

252.    In any event, the Circle Agreement specifically precludes Circle from attempting to shut FT Partners out of its contractually entitled fee in such a manner, stating that if Circle purported to terminate the Circle Agreement on the basis that neither Mr. McLaughlin nor Mr. Little was the lead or co-lead advisors for FTP Partners on its work for Circle, "FT Partners will [still] be entitled to any applicable Transaction Fee if, within twelve (12) months of the effective date of such termination (the '**Tail Period**'), the Company consummates or enters into any agreement that subsequently results in any Transaction."[19]  The Circle Agreement further precludes Circle from attempting to claim that it owes no fee to FT Partners because of the amount of FT Partners' work on the Transaction, stating "**[f]or further avoidance of doubt, any applicable Transaction Fees with respect to any Transactions completed during the term of this letter agreement will be payable to FT Partners in accordance with Section 2 of this letter agreement regardless of how much time has elapsed from the date of this letter agreement and without regard for the extent to which the Company actively involves FT Partners in such Transactions.**"  (Emphasis added.)

253.    Because none of the required conditions (let alone all) for any termination was met, the Circle Agreement remains in effect following Circle's purported termination.  (*See* Ex. A, § 6 (termination "shall only be effective" if specified conditions were met).)

---

[19]    Even if Circle could validly terminate the Circle Agreement on the basis of this particular provision, which it cannot, it would still owe FT Partners a Transaction Fee for the May 2022 Capital Raise because that transaction was both consummated and entered into within twelve months of the purported termination.

254.     In the alternative, even if a valid Good Reason had arisen, Circle waived its ability to terminate the Circle Agreement by continuing to accept FT Partners' performance under the Circle Agreement rather than promptly terminating the Circle Agreement.  The fee dispute and Circle's attempt to sideline Mr. McLaughlin—which are FT Partners' best guesses as to the unspecified Good Reasons Circle invoked in the Circle Notice—each occurred at least a year before Circle's purported termination of the Circle Agreement.  Circle kept the Circle Agreement in effect during that period so that it could continue to benefit from FT Partners' performance of the Circle Agreement, which included not only the services FT Partners provided, but also the fact that by keeping the Circle Agreement in effect, Circle (i) had FT Partners available to it for advisory services; and (ii) prevented FT Partners from taking on any work for another client in a transaction opposite Circle.  Under the election of remedies and waiver doctrines, Circle's decision to continue accepting FT Partners' performance well after any supposed Good Reason had arisen precludes Circle from terminating the Circle Agreement once it became convenient to Circle to do so.

255.     Following the purported termination of the Circle Agreement, Circle also ceased paying the agreed-upon quarterly retainer in violation of Section 2(a) of the Circle Agreement.

**O.     FT Partners' Efforts for Circle Result in the $401 Million May 2022 Capital Raise**

256.     On April 12, 2022, just two business days after Circle purported to terminate the Circle Agreement, it announced the May 2022 Capital Raise.[20]  This timing makes clear that Circle's purported termination of the Circle Agreement was an attempt—not made in good faith by Circle's board—to avoid paying FT Partners a Capital Raise fee in connection with the May

---

[20]    *Circle     Announces     $400M     Funding     Round*  (May     10,     2022), https://www.circle.com/en/pressroom/circle-announces-400m-funding-round.

2022 Capital Raise as well as a Company Sale fee in connection with the Acquisition.  The May 2022 Capital Raise constitutes a Capital Raise under the Circle Agreement, and thus entitles FT Partners to a Transaction Fee.

257.    The May 2022 Capital Raise was a $401 million funding round with BlackRock, Inc., Fidelity Management and Research, Marshall Wace LLP, and Fin Capital as the investors.

258.    FT Partners' prior work for Circle led directly to this May 2022 Capital Raise by helping to secure the participation of each of the four investors who made up that round.[21]  For example, as part of the FT Partners' work for Circle, FT Partners reached out to and had discussions with Marshall Wace LLP, which was a key part of securing its participation as an investor in the Convertible Note Financing.  FT Partners also worked with Fidelity on, and had reached out to Fin Capital regarding, the Convertible Note Financing.  Moreover, BlackRock was a former client of FT Partners with whom FT Partners had previously discussed Circle.

259.    Circle thus directly benefited from FT Partners' relationships and the work that FT Partners did for Circle.

**P.    Circle's Failure to Pay FT Partners the Agreed-Upon Fee in Connection with the May 2022 Capital Raise**

260.    The May 2022 Capital Raise closed on May 9, 2022 and raised another $401 million for Circle.  Under the terms of the Circle Agreement, Circle was supposed to have paid FT Partners its Capital Raise fee "simultaneously with, or prior to, the consummation" of the May 2022 Capital Raise.  Circle did not do so.

---

[21]    For the avoidance of doubt, FT Partners was not required to do any work on this Capital Raise in order to earn a Transaction Fee, unless requested to do so by Circle.  (Ex. A, § 6 (making Transaction Fees payable "without regard for the extent to which [Circle] actively involves FT Partners in such Transactions").)

261.    On August 19, 2022, FT Partners sent Circle an invoice for a Transaction Fee of $28.07 million for the May 2022 Capital Raise pursuant to Section 2(b)(ii) of the Circle Agreement.  FT Partners also requested that Circle provide a complete set of transaction documents, as required by Section 7(a) of the Circle Agreement.

262.    On October 10, 2022, Circle refused to pay FT Partners the Transaction Fee owed for the May 2022 Capital Raise, thus attempting to benefit unjustly from FT Partners' efforts on Circle's behalf without compensating FT Partners.  Circle also has refused to provide FT Partners with transaction documents for the May 2022 Capital Raise.

263.    Section 2(e) of the Circle Agreement obligates Circle to pay "interest at the rate of two percent (2%) per month, or the highest rate permitted by law if less, until paid in full" when Circle "fails to timely pay the fees," "unless the payment of the fees or expenses is contested in good faith by [Circle]."  As described above, Circle's refusal to pay FT Partners is not in good faith, so FT Partners is entitled to additional interest payments for every month that Circle delays paying fees for the May 2022 Capital Raise.

264.    Moreover, Section 10 of the Circle Agreement requires Circle to pay FT Partners its "reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which [FT Partners] may be entitled in connection with any action to enforce this letter agreement."

265.    And, as described above, Circle was also required under Section 9 of the Circle Agreement to reference FT Partners' role as exclusive financial and strategic advisor to Circle and its Board.  Once again, Circle breached this obligation by not including any reference to FT Partners in its press release.

**Q.    Circle Purports to Terminate the SeedInvest Agreement**

266.    Circle next expanded its attempts to bully FT Partners into accepting a lower or no fee under the Circle Agreement by roping its SeedInvest subsidiaries and an unrelated agreement into the dispute.

267.    Specifically, on August 26, 2022, Circle sent FT Partners the generic one-paragraph SeedInvest Notice (replicated in full below) purporting to terminate the SeedInvest Agreement:

August 26, 2022

CONFIDENTIAL
VIA E-MAIL
Steve.McLaughlin@FTPartners.com

Financial Technology Partners LP | FTP Securities LLC
1 Front Street 31st Floor
San Francisco CA 94111

Re:    **NOTICE OF TERMINATION**

Dear Steve:

    I am writing in my capacity as Circle's Chairman and CEO, with regard to the September 19, 2020 engagement letter between (i) Financial Technology Partners LP and its wholly-owned subsidiary, FTP Securities LLC and their successors (together, "FT Partners") and (ii) Circle Internet Financial Limited on behalf of itself and on behalf of its wholly-owned subsidiary, Pluto Holdings, Inc. ("Pluto") and Pluto's wholly-owned subsidiaries, SeedInvest Technology LLC, SI Securities LLC and SI Advisors (the "SeedInvest Engagement Letter"). This letter will serve as notice that the SeedInvest Engagement Letter is hereby immediately terminated for Good Reason under Section 6 of the SeedInvest Engagement Letter. Circle's Board of Directors has determined in good faith that FT Partners has and has had conflicts of interest materially detrimental to Circle that have not been waived by Circle; and that neither you nor Randall Little are the lead or co-lead advisor for FT Partners representing FT Partners and actively involved in any prospective Transaction. The Board has further determined that these matters have not been and cannot be cured.

Sincerely,



Jeremy D. Allaire

cc: Michael B. Carlinsky, Quinn Emanuel Urquhart & Sullivan, LLP

○ CIRCLE          Circle Internet Financial LLC  circle.com

268.    As with the Circle Notice, the SeedInvest Notice provides absolutely no specifications or justifications other than cutting and pasting certain portions of the language of Section 6 of the SeedInvest Agreement. This is unsurprising, as neither Circle nor SeedInvest had

ever indicated any potential issues with FT Partners' work for SeedInvest. Notably, Circle did not allege that FT Partners has breached the SeedInvest Agreement or caused any harm to SeedInvest.

269.    Accordingly, the supposed determination of Circle's Board of Directors to terminate the SeedInvest Agreement was obviously not made in good faith. Indeed, FT Partners has noted this for Circle, but Circle has refused to provide any information for the basis of any of the Good Reasons it claims permitted it to terminate the SeedInvest Agreement or any supporting evidence of any Good Reason. Rather, the purported termination was a transparent attempt by the Circle Board members—all of whom have a significant personal economic incentive not to pay FT Partners its contractually owed fees—to give Circle additional leverage in its dispute with FT Partners over the Circle Agreement. It was also an improper attempt to deny yet another fee to FT Partners: just nine days earlier, Circle had entered into a non-disclosure agreement with StartEngine concerning a possible sale of SeedInvest, which would entitle FT Partners to a Transaction Fee under the SeedInvest Agreement.

270.    As noted above, Circle could only terminate the SeedInvest Agreement if all of the following occurred: (i) one or more of the three specified Good Reasons has, in fact, occurred; (ii) Circle's Board then makes a good-faith determination that a Good Reason has occurred; (iii) Circle timely gives FT Partners written notice that Circle's Board has determined in good faith that "such Good Reason" exists, and that notice provides FT Partners with sufficient information concerning the specified Good Reason to allow FT Partners to determine whether it can cure the Good Reason and how to cure the Good Reason; (iv) if curable, FT Partners does not cure the Good Reason within 30 days of notice; and (v) if curable, Circle's Board then determines in good faith that FT Partners has failed to cure such Good Reason within 30 days. If any of these preconditions are not met, a termination "shall" not "be effective." (Ex. B, § 6.)

271.    Exactly none of these multitude of conditions was met as to either of the purported Good Reasons, when in fact each and every one of the conditions would have needed to have been met to effectuate a termination.

272.    Circle's first purported Good Reason was that "FT Partners has and has had conflicts of interest materially detrimental to Circle that have not been waived by Circle."  This argument fails.

273.    *First*, FT Partners has never had "conflicts of interest materially detrimental to Circle that have not been waived by Circle."  The dispute over the Transaction Fee for a Company Sale of Circle to Concord was, of course, not a dispute involving the SeedInvest Agreement, and so a completely invalid basis for terminating it.  Moreover, even if Circle's alleged views about FT Partners' entitlement to a Company Sale for the Acquisition under the Circle Agreement could contractually infect the SeedInvest Agreement (which it cannot), there is simply no conflict of interest here because both Circle and FT Partners wanted Concord to acquire Circle on the most optimal set of terms, as explained *supra* at ¶ 241.  Accordingly, this Good Reason did not exist.

274.    *Second*, given this, Circle's Board could not, in good faith, have definitively determined otherwise.  Indeed, that Circle waited over four months between purporting to terminate the Circle Agreement and purporting to terminate the SeedInvest Agreement—despite the fact that the purported basis for terminating these agreements is apparently the same—shows that the termination of the SeedInvest Agreement is just a continuation of the rank gamesmanship and lack of good faith that Circle has engaged in with FT Partners to avoid paying the fees to which FT Partners is entitled.  Notably, Circle sent the SeedInvest Agreement termination notice one week after FT Partners sent Circle an invoice for the Transaction Fee on the May 2022 Capital Raise.

275.   *Third*, the SeedInvest Notice failed to provide any detail about: (i) what the purported conflicts of interest were; and (ii) how those purported conflicts were materially detrimental to Circle.  As a result, Circle failed to comply with its obligation to provide FT Partners with sufficient information about the purported Good Reason to permit FT Partners to determine whether the purported Good Reason could be cured, and if so, how.

276.   *Fourth*, the purported Good Reason was curable, and had Circle provided FT Partners the required 30 days to cure, FT Partners would have done so.  Importantly, the SeedInvest Agreement does not permit Circle's Board to unilaterally determine whether a Good Reason is curable.  In the alternative, if the purported Good Reason was curable when it initially occurred, but was no longer curable as of the date of the SeedInvest Notice, then Circle impermissibly delayed giving notice of the purported Good Reason, thus improperly nullifying FT Partners' required opportunity to attempt to cure.

277.   *Fifth*, because Circle did not provide FT Partners the required 30 days to cure, Circle's Board never made a good faith determination that FT Partners had failed to cure.

278.   Circle's second purported Good Reason was that "neither [Steven J. McLaughlin] nor Randall Little [was] the lead or co-lead advisor for FT Partners representing FT Partners and actively involved in any prospective Transaction."  This argument likewise fails.

279.   *First*, as to Mr. McLaughlin, this supposed basis for termination is a fiction completely of Circle's own attempted making, and as to Mr. Little, this supposed basis is blatantly false.  Messrs. McLaughlin and Little were very actively involved in every aspect of SeedInvest's prospective transactions until Circle wrongfully attempted to manufacture a pretext for terminating the Circle Agreement by instructing that Mr. McLaughlin no longer be involved in working for Circle.  Even after that, Mr. Little continued to be the lead or co-lead advisor for FT Partners in its

work for SeedInvest until the SeedInvest Acquisition closed and the SeedInvest Agreement terminated (with certain provisions surviving). And as FT Partners has repeatedly made clear to Circle, Mr. McLaughlin was "ready, willing, and able" to assist SeedInvest in any transaction until the SeedInvest Acquisition closed. Accordingly, this Good Reason did not exist.[22]

280.    *Second*, given this, Circle's Board could not, in good faith, have definitively determined otherwise. Indeed, that Circle waited over four months between purporting to terminate the Circle Agreement and purporting to terminate the SeedInvest Agreement—despite the fact that the purported basis for terminating these agreements is apparently the same—shows that the termination of the SeedInvest Agreement is just a continuation of the rank gamesmanship and lack of good faith that Circle has engaged in with FT Partners to avoid paying the fees to which FT Partners is entitled. Notably, Circle sent the SeedInvest Agreement termination notice one week after FT Partners sent Circle an invoice for the Transaction Fee on the May 2022 Capital Raise.

281.    *Third*, the SeedInvest Notice failed to provide any detail about how Mr. Little was not the lead or co-lead advisor for FT Partners on SeedInvest matters. As a result, Circle failed to comply with its obligation to provide FT Partners with sufficient information about the purported Good Reason to permit FT Partners to determine whether the purported Good Reason could be cured, and if so, how.

---

[22]    Separately, even if Circle could terminate the SeedInvest Agreement on the supposed basis that neither Mr. McLaughlin nor Mr. Little was the lead or co-lead advisors for FTP Partners on its work for SeedInvest, "FT Partners [still] will be entitled to any applicable Transaction Fee if, within twelve (12) months of the effective date of such termination (the 'Tail Period'), the Company consummates or enters into any agreement that subsequently results in any Transaction." (Ex. B, § 6.) The Asset Purchase Agreement was both consummated and entered into within twelve months of the purported termination.

282.    *Fourth*, the purported Good Reason was curable, and had Circle provided FT Partners the required 30 days to cure, FT Partners would have done so.  Importantly, the SeedInvest Agreement does not permit Circle's Board to unilaterally determine whether a Good Reason is curable.  In the alternative, if the purported Good Reason was curable when it initially occurred, but was no longer curable as of the date of the SeedInvest Notice, then Circle impermissibly delayed giving notice of the purported Good Reason, thus improperly nullifying FT Partners' required opportunity to attempt to cure.

283.    *Fifth*, because Circle did not provide FT Partners the required 30 days to cure, Circle's Board never made a good faith determination that FT Partners had failed to cure.

284.    Because the required conditions for termination were not met, the SeedInvest Agreement remained in effect following Circle's purported termination.  (*See* Ex. B, § 6 (termination "shall only be effective" if specified conditions were met).)

285.    In the alternative, even if a valid Good Reason had arisen, Circle waived its ability to terminate the SeedInvest Agreement by continuing to accept FT Partners' performance under the SeedInvest Agreement rather than promptly terminating the SeedInvest Agreement.  The fee dispute and Circle's attempt to sideline Mr. McLaughlin—which are FT Partners' best guesses as to the unspecified Good Reason Circle invoked in the SeedInvest Notice—occurred more than a year before Circle's purported termination of the SeedInvest Agreement.  Circle kept the SeedInvest Agreement in effect during that period so that it could continue to benefit from FT Partners' performance of the SeedInvest Agreement, which included not only the services FT Partners provided, but also the fact that by keeping the SeedInvest Agreement in effect, Circle (i) had FT Partners available for advisory services; and (ii) prevented FT Partners from taking on any work for another client in a transaction opposite Circle or SeedInvest.  Under the election of

remedies and waiver doctrines, Circle's decision to continue accepting FT Partners' performance well after any supposed Good Reason had arisen precluded Circle from terminating the SeedInvest Agreement once it became convenient to Circle to do so.

286.    Following the purported termination of the SeedInvest Agreement, Circle also ceased paying the agreed-upon quarterly retainer in violation of Section 2(a) of the SeedInvest Agreement.

## R.    Circle Agrees to Sell SeedInvest

287.    On October 24, 2022, Circle, Pluto, and SI Securities entered into the Asset Purchase Agreement with StartEngine and Moonshine.  Under that agreement, Pluto and SI Securities sold, upon closing, substantially all of their assets to Moonshine, including all of Pluto's limited liability membership company interests in SeedInvest Technology.

288.    This transaction, the SeedInvest Acquisition, stemmed from FT Partners' efforts on SeedInvest's behalf, including FT Partners' work on SeedInvest's financial model, virtual data room, presentations, and diligence with respect to earlier potential buyers.  Defendants thus directly benefited from FT Partners' work for SeedInvest.  Moreover, the SeedInvest Acquisition plainly constitutes an SI Sale under the SeedInvest Agreement.

289.    *First*, the SeedInvest Agreement defines SI Sale to include "the sale of all or at least 50% of the issued and outstanding equity securities of SeedInvest to an acquirer." (Ex. B, at Annex B.)  Under the Asset Purchase Agreement, Pluto sold the entirety of SeedInvest Technology's equity securities to Moonshine.

290.    *Second*, the SeedInvest Agreement defines SI Sale to include "the merger or combination of SeedInvest with an acquirer." (*Id.*)  The SeedInvest Acquisition also meets this test because the SeedInvest business has been merged with or combined into StartEngine.

291.     *Finally*, the SeedInvest Agreement defines SI Sale to include "an acquirer's acquisition of all or at least 50% of the assets, properties, revenue, income or business of SeedInvest." (*Id.*)  As stated in StartEngine's SEC filings, under the Asset Purchase Agreement it "acquire[d] substantially all of the assets of the SeedInvest business."

292.     On November 8, 2022, FT Partners sent Circle a preliminary invoice reminding it of its obligation to pay this Transaction Fee upon closing, and requesting the necessary information to calculate this Transaction Fee.  In a November 28, 2022 response, Circle refused to provide this information and made clear it would not pay this Transaction Fee on the basis that it had purportedly terminated the SeedInvest Agreement.  Notably, Circle did not dispute that the SeedInvest Acquisition constitutes an SI Sale.

293.     Circle's refusal constituted an anticipatory breach of its obligation to pay FT Partners a Transaction fee upon closing of the SeedInvest Acquisition.  It also violated Section 7(a) of the SeedInvest Agreement, which requires Circle to provide FT Partners with, "upon request, any documentation FT Partners may reasonably request in order to calculate the Transaction Fee due hereunder."

## S.     Circle and Concord Call Off the Acquisition

294.     On December 5, 2022, Circle and Concord announced that they had mutually agreed to terminate the proposed Acquisition because the SEC was not going to declare the S-4 concerning the Acquisition effective in advance of Concord's December 10, 2022 deadline to consummate a transaction.  Although the termination of the Acquisition means that FT Partners will not be entitled to a fee in connection with the Acquisition, Circle's efforts commenced solely to avoid paying that very fee led to a series of breaches of both the Circle Agreement and the SeedInvest Agreement.  Those breaches culminated in Circle's attempts to improperly terminate the Circle Agreement and SeedInvest Agreement, Circle's refusal to pay FT Partners the agreed-

upon fee for the May 2022 Capital Raise, SeedInvest Acquisition, and August 2023 Capital Raise, and Circle's failure to give FT Partners credit as its exclusive financial and strategic advisor. Circle's failure to close the Acquisition therefore mooted just one of its many breaches.

295.    Because the Acquisition never closed, FT Partners never sent Circle an invoice, nor did FT Partners reach a final conclusion on what the Transaction Fee for the Acquisition would have been.  Throughout this time, FT Partners made clear that if the Acquisition did close, it would be a Company Sale, and that FT Partners was willing to negotiate how that Transaction Fee would be paid, for example by accepting part or all of it in stock, deferring part of the payment, or restructuring the payment.  FT Partners even said it would be willing to consider receiving an alternative transaction fee if Circle agreed that the Circle Agreement would remain in effect following closing of the Acquisition.  This would reduce the amount Circle would pay FT Partners upon closing of the Acquisition, though it could increase the overall amount Circle would eventually need to pay if it entered into a Company Sale in the future.  Circle refused to do so.

**T.    Circle Enters into a Transaction with Alameda Research**

296.    On information and belief, Circle has entered into an additional Transaction for which FT Partners is entitled to a Transaction Fee.

297.    On December 6, 2022, the *Financial Times* reported on the venture capital investments made by Alameda Research.  Kadhim Shubber and Bryce Elder, *Revealed: the Alameda Venture Capital Portfolio* (Dec. 6, 2022), https://www.ft.com/content/aaa4a42c-efcc-4c60-9dc6-ba6cccb599e6.   The spreadsheet shown in the article indicates that "Maclaurin Investments Ltd (fka Alameda Ventures Ltd.)" invested "$10,000,000" in a "Convertible Note" in "Circle," which is described as a "Stablecoin" company with a "$3,500,000,000" valuation.  *Id.* (row 55).

298.    Circle did not inform FT Partners of the details of this Transaction, but a convertible note would be a Capital Raise.  (Ex. A, at Annex B (defining Capital Raise to include transactions involving "equity-linked interests (including, without limitation, convertible debt, debt with warrants or hybrid capital)").)

299.    FT Partners intends to pursue discovery into this Transaction and reserves all rights to amend its complaint to add additional claims based on it.

**U.    The SeedInvest Acquisition Closes**

300.    The SeedInvest Acquisition closed on May 5, 2023.  Because the SeedInvest Agreement was still in effect, Circle's obligation to pay FT Partners a Transaction Fee for the SeedInvest Acquisition became due on May 5, 2023.

301.    On November 17, 2023, FT Partners sent Circle an invoice reminding Circle of its obligation to pay FT Partners the SeedInvest Acquisition Transaction Fee and to reimburse the expenses that FT Partners had incurred in its work for SeedInvest.[23]

302.    To date, Circle has not paid that Transaction Fee, thus attempting to unjustly benefit from FT Partners' efforts on Circle's behalf without compensating FT Partners.[24]

303.    Section 2(e) of the SeedInvest Agreement obligates Circle to pay "interest at the rate of two percent (2%) per month, or the highest rate permitted by law if less, until paid in full" when Circle "fails to timely pay the fees," "unless the payment of the fees or expenses is contested

---

[23]    Because Circle has refused to provide FT Partners with information sufficient to calculate the applicable Transaction Fee, the invoice only bills Circle for the minimum Transaction Fee amount, with the remainder, if any, to be calculated upon receipt of the necessary information.

[24]    For the avoidance of doubt, although FT Partners had already done substantial work to find an acquirer for SeedInvest, it was not required to do any work on this SI Sale in order to earn a Transaction Fee.  (Ex. B, § 6 (making Transaction Fees payable "without regard for the extent to which [Circle] actively involves FT Partners in such Transactions").)

in good faith by [Circle]." As described above, Circle's refusal to pay FT Partners is not in good faith, so FT Partners is entitled to additional interest payments for every month that Circle delays paying fees for the SeedInvest Acquisition.

304.    Moreover, Section 10 of the SeedInvest Agreement requires Circle to pay FT Partners its "reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which [FT Partners] may be entitled in connection with any action to enforce this letter agreement."

## V.    Circle Enters into a Capital Raise with Coinbase

305.    On August 18, 2023, Circle entered into the August 2023 Capital Raise, which was a share transfer agreement with Coinbase. In that Transaction, Circle sold Coinbase 3.5% of Circle's fully diluted equity at an estimated fair market value of $51.1 million. In return, Circle received Coinbase's 50% interest in Centre Consortium LLC, a joint venture co-founded by Circle and Coinbase in 2018 to promote stablecoins.

306.    This Transaction constitutes a Capital Raise within the meaning of the Circle Agreement because Circle "s[old]" its "equity interests" to Coinbase, and so FT Partners is entitled to 7% of the "gross proceeds" of that sale. Where, as here, those proceeds were in-kind, FT Partners is entitled to 7% of the fair market value that Circle received as proceeds of the sale, *i.e.*, 7% of $51.1 million. Because the Circle Agreement is still in effect, Circle's obligation to pay FT Partners a Transaction Fee for the August 2023 Capital Raise became due on August 18, 2023.

307.    On November 17, 2023, FT Partners sent Circle an invoice reminding Circle of its obligation to pay FT Partners that $3.577 million Capital Raise fee. To date, Circle has improperly refused to pay that fee. FT Partners also requested that Circle provide a complete set of transaction documents, as required by Section 7(a) of the Circle Agreement. Circle has not done so.

308.    Section 2(e) of the Circle Agreement obligates Circle to pay "interest at the rate of two percent (2%) per month, or the highest rate permitted by law if less, until paid in full" when Circle "fails to timely pay the fees," "unless the payment of the fees or expenses is contested in good faith by [Circle]."  As described above, Circle's refusal to pay FT Partners is not in good faith, so FT Partners is entitled to additional interest payments for every month that Circle delays paying fees for the August 2023 Capital Raise.

309.    Moreover, Section 10 of the Circle Agreement requires Circle to pay FT Partners its "reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which [FT Partners] may be entitled in connection with any action to enforce this letter agreement."

310.    And, as described above, Circle was also required under Section 9 of the Circle Agreement to reference FT Partners or FT Partners' role as exclusive financial and strategic advisor to Circle and its Board.  Once again, Circle breached this obligation by not including any reference to FT Partners in its press release announcing the Transaction.[25]

**W.    Circle Reorganizes.**

311.    Effective July 1, 2024, Circle consummated a Scheme of Arrangement ("Scheme"). As part of that Scheme, Circle's shares held by its shareholders were cancelled and shares of Circle were issued to Circle US, which is a recently created Delaware corporation.  Circle's former shareholders then received shares in Circle US.  Circle also transferred certain assets to Circle US.

---

[25]    *Ushering    in    the    Next    Chapter    for    USDC*    (Aug.    21,    2023), https://www.circle.com/blog/ushering-in-the-next-chapter-for-usdc.

312.    As a result of the Scheme: (i) Circle became a wholly owned subsidiary of Circle US; (ii) Circle's shareholders became shareholders of Circle US instead of Circle; and (iii) Circle US became the top level holding company of the Circle group.

313.    FT Partners is currently evaluating what effects the Scheme had on the Circle Agreement and SeedInvest Agreements.  These include whether the Scheme constituted a Company Sale under the Circle Agreement and whether Circle US is bound by the Circle Agreement and SeedInvest Agreement as Circle's successor.  FT Partners reserves all rights with respect to the Scheme.

**COUNT ONE**
**Declaratory Judgment (Circle Agreement)**

314.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

315.    Because Circle's Board: (i) did not have a Good Reason for terminating the Circle Agreement, (ii) did not determine in good faith that such a Good Reason existed, and (iii) did not timely provide FT Partners with a sufficiently detailed notice and a timely opportunity to cure any purported Good Reason, FT Partners is entitled to a declaration that the Circle Agreement has been and remains in full force and effect following Circle's purported termination.

**COUNT TWO**
**Breach of Contract (Circle Agreement)**

316.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

317.    At all relevant times, FT Partners and Circle have been parties to the Circle Agreement, which is a valid and enforceable contract.

318.    FT Partners has complied with its obligations under the Circle Agreement in full.

319.    Circle has repeatedly violated and continues to violate the Circle Agreement:

a)  Circle violated Section 6 of the Circle Agreement when its Board purported to terminate the Circle Agreement: (i) without Good Reason; (ii) without having made a good-faith determination that a Good Reason existed; and (iii) without providing FT Partners sufficient and timely notice of the Good Reason nor any opportunity to cure any purported Good Reason;

b)  Circle has violated and continues to violate Section 2 of the Circle Agreement by refusing to pay FT Partners its agreed-upon Transaction Fee for the May 2022 Capital Raise;

c)  Circle has violated and continues to violate Section 2 of the Circle Agreement by refusing to pay FT Partners its agreed-upon Transaction Fee for the August 2023 Capital Raise;

d)  Circle has violated and continues to violate Section 2 of the Circle Agreement by refusing to pay FT Partners its agreed-upon quarterly retainer;

e)  Circle has committed an anticipatory breach of Section 2 of the Circle Agreement by stating that it would not pay FT Partners its agreed-upon Transaction Fee for a future Capital Raise(s), Company Sale, or alternative transaction(s);

f)  Circle has violated and continues to violate Section 9 of the Circle Agreement by issuing press releases with respect to the Convertible Note Financing, the May 2022 Capital Raise, the August 2023 Capital Raise, and the Acquisition that do not reference FT Partners' role as Circle's exclusive financial and strategic advisor, and by failing to issue corrective press releases;

g) Circle has violated and continues to violate Section 9 of the Circle Agreement by unreasonably withholding its approval for FT Partners' announcements detailing its role as Circle's exclusive financial advisor with respect to the Convertible Note Financing and the Acquisition;

h) Circle has violated and continues to violate Section 7(a) of the Circle Agreement by refusing to advise FT Partners of all developments materially affecting Circle and any proposed Transaction;

i) Circle has violated and continues to violate Section 7(a) and (c) of the Circle Agreement: (i) by refusing to provide relevant draft documents to FT Partners in real time, including full drafts of the Forms S-4 and related documents, the Business Combination Agreement and related documents, the Transaction Agreement and related documents, documents relating to the May 2022 Capital Raise, and documents relating to the August 2023 Capital Raise; (ii) when sending FT Partners draft excerpts of the Forms S-4 that mention FT Partners and its advice, by refusing to provide FT Partners with sufficient time or context to review those excerpts; and (iii) by refusing to provide FT Partners with the documentation necessary to calculate the Transaction Fees for the May 2022 Capital Raise and August 2023 Capital Raise.

j) Circle has violated and continues to violate Section 7(c) of the Circle Agreement by: (i) filing Forms S-4 that include disclosures mentioning FT Partners and its advice that are not in a form and substance satisfactory to FT Partners and its counsel; and (ii) not filing amended Forms S-4, or a corrective

press release, that correct these disclosures to FT Partners' and its counsel's satisfaction.

320. As a direct and proximate result of Circle's breaches of contract, FT Partners has been damaged. These breaches are ongoing and FT Partners continues to suffer damage as a result.

321. Moreover, Circle has denied FT Partners the publicity to which FT Partners is entitled through: (i) Circle's failure to reference in its press releases FT Partners' role as Circle's exclusive financial and strategic advisor with respect to the Convertible Note Financing, the May 2022 Capital Raise, the August 2023 Capital Raise, and the Acquisition; and (ii) Circle's unreasonable refusal to approve FT Partners' proposed announcements regarding the Convertible Note Financing and the Acquisition.

322. Because the value of that publicity will be difficult to accurately ascertain, FT Partners is also entitled to specific performance in the form of requiring Circle to: (i) issue corrective press releases that reference FT Partners' role as Circle's exclusive financial and strategic advisor with respect to the Convertible Note Financing, the May 2022 Capital Raise, the August 2023 Capital Raise, and the Acquisition; (ii) issue a press release correcting the misstatements and omissions in the Forms S-4; and (iii) approve FT Partners' proposed announcements for the Convertible Note Financing and the Acquisition.

323. FT Partners is also entitled to a declaration that under the Circle Agreement, Circle must reference FT Partners' role as Circle's exclusive financial and strategic advisor with respect to the Convertible Note Financing, May 2022 Capital Raise, August 2023 Capital Raise, and the Acquisition in any press releases concerning those transactions, and that Circle's prior press releases concerning those transactions are therefore in breach of the Circle Agreement.

## COUNT THREE
### Breach of Contract (SeedInvest Agreement)

324.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

325.    At all relevant times, FT Partners and Defendants have been parties to the SeedInvest Agreement, which is a valid and enforceable contract.

326.    FT Partners has complied with its obligations under the SeedInvest Agreement in full.

327.    Defendants have repeatedly violated and continue to violate the SeedInvest Agreement:

a)  Defendants have violated Section 6 of the SeedInvest Agreement by purporting to terminate the SeedInvest Agreement: (i) without Good Reason; (ii) without having made a good-faith determination that a Good Reason existed; and (iii) without providing FT Partners sufficient and timely notice of the Good Reason and an opportunity to cure any purported Good Reason.

b)  Circle has violated and continues to violate Section 2 of the SeedInvest Agreement by refusing to pay FT Partners its agreed-upon quarterly retainer;

c)  Circle has violated and continues to violate Section 2 of the SeedInvest Agreement by not paying FT Partners its agreed-upon Transaction Fee for the SeedInvest Acquisition;

d)  Circle has violated and continues to violate Section 3 of the SeedInvest Agreement by refusing to reimburse FT Partners for expenses; and

e)  Circle has violated and continues to violate Section 7(a) of the SeedInvest Agreement by refusing to provide FT Partners with the documentation necessary to calculate the Transaction Fee for the SeedInvest Acquisition.

328.    As a direct and proximate result of Defendants' breach of contract, FT Partners has been damaged.  This breach is ongoing and FT Partners continues to suffer damage as a result.

<u>COUNT FOUR</u>
**Breach of the Implied Covenant of Good Faith and Fair Dealing (Circle Agreement)**

329.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

330.    Circle violated the Circle Agreement's implied covenant of good faith and fair dealing by attempting to bully FT Partners into accepting a lower fee than it was entitled to under the Circle Agreement.

331.    Circle then violated the Circle Agreement's implied covenant by attempting to deprive FT Partners of its fees entirely.  Among other things, Circle manufactured grounds to terminate the Circle Agreement by attempting to cut FT Partners out of transactions, prevent FT Partners from fulfilling its contractual role as Circle's exclusive financial and strategic advisor, deprive FT Partners of publicity and credit to which FT Partners is contractually entitled, and otherwise hinder FT Partners' performance of the Circle Agreement.  Circle did so even though FT Partners never sent an invoice for a Transaction Fee stemming from the Acquisition (because the Acquisition had not closed), and even though FT Partners expressed willingness to negotiate about how the Transaction Fee would be paid.

332.    Circle's board, which was not acting in good faith, then sought to terminate the Circle Agreement just two business days before announcing the May 2022 Capital Raise, on alleged grounds that Circle itself purposely sought to create.

333.    Circle did so in an attempt to deprive FT Partners of its contractual right to fees for the significant transactions Circle entered into and which FT Partners helped orchestrate, including fees for the May 2022 Capital Raise and the Acquisition.

334.    Circle's intentional and not-in-good-faith conduct destroyed FT Partners' reasonable expectations of Circle and denied FT Partners the fruits of the parties' bargain in violation of the Circle Agreement's implied covenant of good faith and fair dealing.

## COUNT FIVE
### Breach of the Implied Covenant of Good Faith and Fair Dealing (SeedInvest Agreement)

335.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

336.    Defendants violated the SeedInvest Agreement's implied covenant of good faith and fair dealing by seeking to terminate the SeedInvest Agreement.  This was not done in good faith but rather on alleged grounds that Defendants themselves purposely sought to create.

337.    Defendants did so in order to attempt to bully FT Partners into accepting a lower fee than it was entitled to under the Circle Agreement.

338.    Defendants also sought to terminate the SeedInvest Agreement just two months before announcing the SeedInvest Acquisition, on alleged grounds that Defendants themselves purposely sought to create rather than in good faith.

339.    Defendants did so in an attempt to deprive FT Partners of its contractual right to a Transaction Fee for the SeedInvest Acquisition.

340.    Defendants' intentional and not-in-good-faith conduct destroyed FT Partners' reasonable expectations of Defendants and denied FT Partners the fruits of the parties' bargain in violation of the SeedInvest Agreement's implied covenant of good faith and fair dealing.

## COUNT SIX
### Unjust Enrichment (May 2022 Capital Raise)

341.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

342.    FT Partners alleges, in the alternative to its contract claims set out in Counts Two and Four, that it is entitled to recover under the doctrine of unjust enrichment if it is determined either that the Circle Agreement does not apply to FT Partners' dispute with Circle, or is void or unenforceable.

343.    As a result of FT Partners' advisory services, which helped Circle secure the May 2022 Capital Raise, Circle received $401 million from investors.

344.    Circle was thus unjustly enriched by the advisory services that FT Partners provided to Circle.

345.    FT Partners has demanded that Circle pay for the advisory services that FT Partners rendered, and Circle has refused to do so.

346.    Circle has accepted and retained FT Partners' advisory services inequitably and at FT Partners' expense.

347.    As a result of Circle's retention of the benefit of FT Partners' advisory services without payment to FT Partners, FT Partners has incurred actual expenses, including the value of the significant time and effort expended in order to assist Circle.

## COUNT SEVEN
### Unjust Enrichment (SeedInvest Acquisition)

348.    FT Partners repeats and realleges the allegations set forth in paragraphs 1 through 313 as if fully set forth herein.

349.    FT Partners alleges, in the alternative to its contract claims set out in Counts Three and Five, that it is entitled to recover under the doctrine of unjust enrichment if it is determined

that either the SeedInvest Agreement does not apply to FT Partners' dispute with Defendants, or is void or unenforceable.

350.    As a result of FT Partners' efforts, Circle secured a buyer for SeedInvest and Defendants received the benefit of that transaction.

351.    Defendants were thus enriched by the advisory services that FT Partners provided to Defendants.

352.    FT Partners has demanded that Defendants pay for the advisory services that FT Partners rendered, and Defendants have refused to do so.

353.    Defendants have accepted and retained FT Partners' advisory services inequitably and at FT Partners' expense.

354.    As a result of Defendants' retention of the benefit of FT Partners' advisory services without payment to FT Partners, FT Partners has incurred actual expenses, including the value of the significant time and effort expended on Defendants' behalf.

## **PRAYER FOR RELIEF**

WHEREFORE FT PARTNERS respectfully requests that the Court enter judgment in its favor and against Defendants for the following relief:

a)    A declaration that the Circle Agreement remains in full force and effect following Circle's purported termination;

b)    Actual damages in the amount of the full agreed-upon fee for the May 2022 Capital Raise;

c)    Actual damages in the amount of the full agreed-upon fee for the SeedInvest Acquisition (in such mix of cash and StartEngine securities as FT Partners determines in its sole discretion);

d)    Actual damages in the amount of the full agreed-upon fee for the August 2023 Capital Raise (in such mix of cash and Circle securities as FT Partners determines in its sole discretion);

e)    Actual damages in the amount of the unpaid quarterly retainer payments under the Circle Agreement and SeedInvest Agreement;

f)    Damages for Circle's other breaches of the Circle Agreement;

g)    FT Partners' reasonable and documented out-of-pocket expenses and costs (including client background checks and the reasonable and documented fees and disbursements of external legal counsel) pursuant to Section 3 of the Circle Agreement;

h)    FT Partners' reasonable and documented out-of-pocket expenses and costs (including client background checks and the reasonable and documented fees and disbursements of external legal counsel) pursuant to Section 3 of the SeedInvest Agreement;

i)    FT Partners' reasonable attorney's fees, costs, and necessary disbursements in connection with the enforcement of the Circle Agreement pursuant to Section 10 of the Circle Agreement;

j)    FT Partners' reasonable attorney's fees, costs, and necessary disbursements in connection with the enforcement of the SeedInvest Agreement pursuant to Section 10 of the SeedInvest Agreement;

k)    Interest on the above fees and expenses at the rate of two percent per month, or the highest rate permitted by law if less;

l)    Actual damages in the amount of the damage to FT Partners' reputation, loss of favorable publicity, and lost profits from future business opportunities;

m)    Specific performance of Circle's obligation to (i) issue corrective press releases that reference FT Partners' role as Circle's exclusive financial and strategic advisor with respect to the Convertible Note Financing, May 2022 Capital Raise, August 2023 Capital Raise, and the Acquisition; (ii) issue a press release correcting the misstatements and omissions in the Forms S-4; and (iii) approve FT Partners' proposed announcements for the Convertible Note Financing and the Acquisition;

n)    Specific performance of Circle's obligation to provide FT Partners the documents it is required to provide pursuant to Section 7 of the Circle Agreement and Section 7 of the SeedInvest Agreement;

o)  A declaration that under the Circle Agreement, Circle must reference FT Partners' role as Circle's exclusive financial and strategic advisor with respect to the Convertible Note Financing, May 2022 Capital Raise, August 2023 Capital Raise, and the Acquisition in any press releases concerning those transactions and that Circle's prior press releases concerning those transactions are therefore in breach of the Circle Agreement;

p)  Damages in the amount that Circle was unjustly enriched by FT Partners' efforts in connection with or leading to the May 2022 Capital Raise;

q)  Damages in the amount that Defendants were unjustly enriched by FT Partners' efforts in connection with or leading to SeedInvest Acquisition; and

r)  An award of such other relief as this Court may deem just and proper.

Dated: New York, New York
       July 29, 2024

*Matthew A. Schwartz*

Matthew A. Schwartz
(schwartzmatthew@sullcrom.com)
Benjamin R. Walker (walkerb@sullcrom.com)
Christopher M. Weldon (weldonc@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Plaintiffs Financial Technology
Partners L.P. and FTP Securities LLC*